DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Suppression of Evidence — warrantless entry of home
 Exigent circumstances — progressive, sequential intrusion — reasonableness
Following pleas of no contest to charges of attempted drug abuse, the defendants were found guilty and sentenced to ninety (90) days on a work release program at the Oriana House by the Summit County Common Pleas Court.
Defendants, husband and wife, appeal assigning a single error:
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANTS' MOTION TO SUPPRESS EVIDENCE WHICH WAS THE PRODUCT OF AN ILLEGAL SEARCH OF DEFENDANTS' HOME WHERE NO EXIGENT CIRCUMSTANCES EXISTED TO JUSTIFY THE OFFICERS' NONCONSENSUAL ENTRY AND WARRANTLESS SEARCH OF APPELLANTS' HOME. SUCH ACTIVITY WAS VIOLATIVE OF DEFENDANTS' CONSTITUTIONAL RIGHTS UNDER THE 4TH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 1, SECTION 14 OF THE CONSTITUTION OF THE STATE OF OHIO.
In the afternoon of July 14, 1996, three Akron police officers entered the residence-home of John and Angela Russell, on Oregon Avenue, in Akron. As a consequence of the entry, they discovered contraband, cocaine residue. This criminal prosecution followed.
The singular issue is whether the trial court erred in refusing to suppress the contraband upon the pretrial suppression motion of the defendants.
The motion, and this appeal, claim favor of a fundamental principle of constitutional law:
 "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment to the United States Constitution (emphasis added).
Section 14, Article I of the Ohio Constitution, through almost identical language, provides these same assurances to its people.
The trial court sits as fact finder on such motions. Here the trial court favors us with an extensive judgment, finding facts and concluding that the entry and seizure fall within the "emergency exigency doctrine" and are, therefore, "reasonable" within the meaning of these constitutional provisions. Our inquiry on appeal was recently enunciated by the United States Supreme Court in Ornelas v. United States (1996), 517 U.S. ___, ___,134 L.Ed.2d 911, 920. An appellate court must review the trial court's findings of historical fact only for clear error, giving due weight to inferences drawn from those facts by the trial court. The trial court's legal conclusions, however, are afforded no deference, but are reviewed de novo. Id.
 Exigency/Reasonableness — a Sequential Analysis
The question of whether an entry into a home by peace officers, acting without a warrant, is "reasonable" requires a careful analysis of the sequential and consequential events leading up to and including the entry. An entry can never be found "reasonable" based solely upon the fact that criminal conduct, or contraband, was discovered within the residence. SeeState v. Williams (1978), 55 Ohio St.2d 82, 86. The question is whether the government agents acted reasonably at each step of the process that led from the first contact (inquiry or notice) to ultimate entry and seizure. See, e.g., State v. Ramey (1971),30 Ohio Misc. 89, 94-95. In Ramey, the court invalidated a stop and frisk search saying, "In the instant case, the search having commenced prior to the move to the pocket, said move to the pocket cannot justify the illegal search. * * * In other words, a search (or frisk) cannot be justified by after the fact circumstances or factors." Id.
Not only are the sequence of steps taken by the officers determinable, but the roles the officers are playing at each step bears upon reasonableness. Police officers are not simply criminal law enforcers, charged with investigating criminal conduct and developing and maintaining evidence of crime. They wear other hats, one of which is their community health, safety, and protection role. Police officers are charged with the duty to prevent crime, preserve the peace, and protect persons and property. State v. Hyde (1971), 26 Ohio App.2d 32, 33; R.C.737.11.
An additional component of the reasonableness analysis is the question of whether the test is subjective or objective, i.e., did the officer think he or she was acting reasonably or, would a reasonably prudent officer believe he or she was acting reasonably? Courts have uniformly held that the test is an objective, not subjective one. State v. Andrews (1991), 57 Ohio St.3d 86,87; State v. Edwards (1992), 80 Ohio App.3d 319, 322.
The issue then becomes:
Considering the role that the government officer was executing, would a reasonably prudent officer, in the same or similar circumstances, have taken each step that was, in fact, taken by these officers from initial contact through entry and seizure within the home of the defendants?
The chronological, sequential analysis of the evidence in this case is measured against three basic principles of constitutional law:
Warrantless search and entry upon property by police are perse unreasonable. Katz v. United States (1967), 389 U.S. 347, 357,19 L.Ed.2d 576, 585.
Entry and search, however, can be justified where there exists "an emergency situation, demanding urgent police action."U.S. v. Radka (C.A. 6, 1990), 904 F.2d 357, 361.
The warrantless entry must be "`strictly circumscribed by the exigencies which justify its initiation.'" State v. Applegate
(1994), 68 Ohio St.3d 348, 350, quoting Terry v. Ohio (1968),392 U.S. 1, 26, 20 L.Ed.2d 889, 908.
The most frequently cited rationale for warrantless entry is that the government is acting in something other than a traditional law enforcement capacity, and confronting "risk of danger." U.S. v. Rohrig (C.A. 6, 1996), 98 F.3d 1506, 1516. In considering the line between criminal investigation or prosecution and preservation or protection of life, the inherent necessities of the situation must be considered. See id. at 1511.
 The Sequential Facts
1. On Sunday, July 14, 1996, at approximately 1 p.m., Defendant John Russell's mother called the Akron Police Department expressing concern about the welfare of her son and daughter-in-law. Officer Alissa Brown was dispatched to the Russell home to investigate.
2. The officer found two vehicles at the home, closed doors, and no movement around the house.
3. The officer knocked on the door, but no one answered. She checked the doors and looked inside the windows, but saw no one. She waited approximately five minutes and then left.
4. The officer notified the dispatcher and requested that the caller-mother be notified, and returned to the station.
5. Officer Brown was notified by the dispatcher that Defendant John Russell's mother wanted to speak to her. Officer Brown called the mother, who advised her that the Russells were to have picked up their son at approximately 10 a.m. that day, but had failed to do so.
6. The mother also advised the officer that the parents had not contacted her about their failure to pick up the child.
7. The mother said she had been calling the house and there was no answer.
8. The mother described the vehicles of the Russells.
9. The mother requested the officer to return to the home and enter to check on the welfare of the parents of her grandchild.
10. Officer Brown radioed two other officers who met her at the home at approximately 4:00 that afternoon.
11. The officers talked to neighbors who claimed that they had not seen either of the parents since approximately 10 or 11 p.m. on Saturday evening.
12. The officers observed two cars in the drive that matched the mother's description of the Russells' vehicles.
13. There was no observable movement around the home.
14. The outer screen door on the porch was locked from the inside.
15. The officers walked around the home loudly pounding on doors and yelling, "Akron Police."
16. The effort to arouse anyone inside continued for as long as 20 minutes.
17. Officer Brown notified her Sergeant of the status of the investigation. The Sergeant granted the officers permission to enter the home and check the welfare of its occupants.
Clearly, at this point, the officers were exercising theirhealth and welfare investigative responsibilities and acted"reasonably."
18. Officer Wilmont entered the porch through a screen window, unlocking the porch door and ushering in the other two officers.
19. The front door was locked.
20. Officers kicked at the door unsuccessfully the first time. The third kick was very loud and executed with such force that the entire house shook.
21. There was still no response from anyone inside the house.
At this point the officers continued to act "reasonably" inpursuit of their responsibility to look out for the health andwelfare of whomever might be in the house.
22. Immediately upon the door opening, an officer smelled an odor like a dead body. The officers had experience and were aware of that smell.
At this point the officers reasonably believed there was adead body of some sort in the home, justifying further intrusion.
23. All three officers yelled "Akron Police" over and over as they entered the house. They were concerned that they were entering a murder scene and had guns drawn.
24. There was no audible response at this point.
The officers reasonably believed that this was a crime sceneand that there may be persons in danger or offenders within thehouse. Their role, by now, included both health and safetyconcerns and criminal law investigation. The exigency demanded andallowed that they pursue the entry.
25. The officers continued to yell "Akron Police" as they went through the living room, kitchen, and a child's room.
26. Officers began to go up to the second floor.
The officers continued to have reasonable cause to believethat there were person(s) in need of help and/or a crime had been,or was being committed. In the exercise of theirresponsibilities, they confronted an exigent circumstance allowingfurther investigation and intrusion.
27. A man appeared at the top of the steps, wearing only a t-shirt. Otherwise, he was nude. Four or five times the officers ordered him to show his hands. The man did not comply and appeared to be in a dazed condition.
28. Officers drew guns and the man continued to approach them. They apprehended him and placed him in handcuffs.
29. The man appeared to be under the influence of some controlled substance, likely cocaine.
30. The man continued in such a state and refused or failed to answer questions about his identity.
The officers had enhanced cause to believe that a crime mayhave been committed and there may be a person or persons in dangeror need of assistance in other parts of the house, including theupstairs. At this point, the focus continued to be two pronged —assistance, if needed, and crime.
31. An officer went up the stairs and a female appeared at the top of the stairs. She was unable to walk unassisted and required help to go down the stairs. The police handcuffed her. Like the male, she refused or failed to speak and had a blank stare on her face, appearing to be in a daze.
32. Both the man and the woman were placed in the kitchen.
33. Officers then went upstairs. They discovered bloody sheets, prescription pills strewn about the nightstand, an empty liquor bottle, a pair of scissors, and a pair of panties which appeared to have been cut off someone. These items were in plain view.
34. When no bodies or other individuals were discovered, the officers returned downstairs.
35. In the kitchen, the officers continued to be unable to elicit the identity of the man and woman. While attempting to talk to the man and woman, the officers observed what they believed to be crack cocaine on top of the microwave.
36. The officers placed the man and woman under arrest. One of the officers said, "There's crack here."
37. Thereupon, the woman began to scream at the officers uncontrollably.
38. The man identified himself as Defendant, John Russell, and the woman as his wife, Angela Russell.
39. Additional drugs and paraphernalia were found in the kitchen in plain view.
We conclude that the trial court did not err in concluding that the officers acted reasonably under the circumstances. The defendants' assignments of error are overruled.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this court, directing the County of Summit Akron Municipal Court to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to appellants.
 Exceptions. _______________________________ JOHN R. MILLIGAN
FOR THE COURT
BAIRD, P. J.
REECE, J.
CONCUR.
(Milligan, J., retired Judge of the Fifth District Court of Appeals, sitting by assignment pursuant to Article IV, § 6(C), Constitution.)