The STATE of Ohio, Appellee,

v.

CULGAN, Appellant.

Court of Appeals of Ohio,
Ninth District, Medina County.

Nos. 3163–M and 3164–M.

Decided Dec. 19, 2001.

Dean Holman, Medina County Prosecuting Attorney, and Joseph F. Salzgeber, Assistant Prosecuting Attorney, for appellee.

James L. Burdon, Akron, for appellant.

CARR, Judge.

{¶1} Appellant Clifford Culgan appeals the decision of the Medina County Court of Common Pleas sentencing him to three hundred sixty days in the Medina County Jail. This court affirms.

{¶2} On December 30, 1999, Patrolman ("Ptl.") Christopher Ryba of the Montville Township Police Department and Ptl. Grice of the Medina City Police Department accompanied Susie Gambaccini, an investigative social worker with Medina County Job and Family Services Agency ("agency"), to the Culgan residence in Montville Township. The agency had an order of access issued by the Medina County Juvenile Court which permitted it access to appellant's nine-year-old daughter, to check on her welfare and well-being. The order of access was issued in a pending educational neglect case. The agency had also received calls regarding drug use at the Culgan residence.

{¶3} Gambaccini became concerned for appellant's daughter's safety and welfare after receiving a phone call from Ptl. Ryba regarding a call he had answered the previous night. The owner of the Holiday Inn Express hotel in Medina County had called concerning a female guest who appeared to be under the influence of alcohol and/or drugs. Ptl. Ryba identified the woman as Kathy Williams and began questioning her about the disturbance at the hotel. Williams told Ptl. Ryba that she was upset because when she woke up that morning, the people she had been with in the hotel room the night before were gone. She did not know where she was, and she said she just wanted to go home. Upon further questioning by Ptl. Ryba, Williams identified a man that Ptl. Ryba believed to be appellant as one of three people who had been partying with her in the hotel room the night before. The other gentleman that Williams named was John Demarco. Ptl. Ryba was familiar with Demarco because he had previously made a traffic stop of Demarco's vehicle and found drug paraphernalia inside it. Williams identified the third person with whom she had been partying as Jackie Mack. Williams went on to explain that Demarco was Mack's "sugardaddy," which meant that Demarco provided Mack with illegal drugs in exchange for sexual or other favors.

{¶4} After obtaining Williams's consent, Ptl. Ryba searched the hotel room and found drug paraphernalia used to smoke crack cocaine and a small duffel bag containing female children's clothing. Williams was unable to tell Ptl. Ryba whether there were children present at the hotel the night before.

{¶5} Ptl. Ryba knew of the case pending in the Medina Juvenile Court regarding appellant's daughter, so he contacted Gambaccini to make her aware of the situation. The agency considered this an emergency report pursuant to Ohio Adm.Code 5101:2–34–32(C) and (D) that required the agency to attempt face-to-face contact with appellant's daughter within one hour. Ptl. Ryba was asked to accompany Gambaccini to the Culgan residence.

{¶6} Upon arriving at the Culgan residence, Gambaccini rang the doorbell. Appellant came to the door and asked who was there. Gambaccini identified herself to the appellant and asked to see appellant's daughter. Appellant told Gambaccini that appellant's daughter had been taken to her maternal grandmother's house the day before. When asked for the grandmother's name, address, and phone number, appellant responded that he did not know her name and did not remember her phone number.

{¶7} Ptl. Ryba asked appellant if he was the only person in the home. Appellant said that his wife was in the shower. Ptl. Ryba asked appellant to have Mrs. Culgan come to the door so that he and Gambaccini could speak with her. When Mrs. Culgan came to the door, Gambaccini stepped into the foyer to speak with her. At this time, Ptl. Ryba and appellant were talking on the front porch.

{¶8} Appellant told Ptl. Ryba that he was not at the hotel the night before. He said that he simply dropped Demarco and Mack off at the hotel, and that he had not seen them since.

{¶9} When Gambaccini inquired as to appellant's daughter's whereabouts, Mrs. Culgan said that appellant's daughter had been taken to her grandmother's home the week before. Gambaccini informed Mrs. Culgan that her husband had said that his daughter was taken to her grandmother's the day before. Mrs. Culgan then began to cry and beg Gambaccini not to take her daughter away. While speaking with Mrs. Culgan, Gambaccini heard a noise coming from the second floor of the home and saw a pair of human legs running across the floor upstairs. Mrs. Culgan told Gambaccini that there was not anyone else in the home and that she must have seen the family cat.

{¶10} Gambaccini stepped out onto the porch and informed Ptl. Ryba of Mrs. Culgan's conflicting story regarding appellant's daughter's visit to her grandmother's and what she had observed upstairs while speaking with Mrs. Culgan. Appellant then told Gambaccini that she must have seen the family dog, which was white in color. Gambaccini insisted that she had seen a pair of human legs. Ptl. Ryba then entered the dwelling to speak to Mrs. Culgan.

{¶11} While Ptl. Ryba was speaking with Mrs. Culgan, she became very upset and asked Ptl. Ryba repeatedly not to take her daughter away. Ptl. Ryba then heard a thud from the upstairs and returned to the front porch where the appellant and Gambaccini were standing. While Ptl. Ryba was speaking with Mrs. Culgan, Gambaccini had used her cellular phone to call appellant's daughter's grandmother to learn whether appellant's daughter was in fact staying there. The grandmother informed Gambaccini that appellant's daughter was not there. It was then clear to Ptl. Ryba that the Culgans were lying about appellant's daughter's whereabouts.

{¶12} Concerned for appellant's daughter's safety and welfare, Ptl. Ryba entered the Culgan residence and asked Mrs. Culgan again whether Caitlin was in the house. Mrs. Culgan did not respond verbally, but she nodded her head and began crying and asking Ptl. Ryba not to take her daughter. Ptl. Ryba then approached the steps and called out Caitlin's name. He went up the steps and down the hall in the direction in which Gambaccini said she saw the pair of legs running. From the hallway, Ptl. Ryba saw a female head duck into a closet in a bedroom. Upon entering the bedroom, Ptl. Ryba saw a loaded "banana clip" for an automatic weapon lying on the bed. Ptl. Ryba called for the woman to come out of the closet. It was Jackie Mack, one of the people that Ms. Williams said was partying with her in the hotel room the previous night.

{¶13} While Ptl. Ryba was escorting Mack outside, she told him that she and John Demarco were hiding appellant's daughter for the appellant. At this point, Mrs. Culgan brought appellant's daughter to Gambaccini in the foyer.

{¶14} During Ptl. Ryba's initial search of the dwelling, other officers arrived. The other officers conducted a protective sweep of the Culgan residence to search for Demarco and another person that Ptl. Ryba thought may be in the house. While conducting the protective sweep, Deputy Scott Phillips, a firearms training officer for the Medina County Sheriff's Department, observed the same clip that Ptl. Ryba had seen. Deputy Phillips believed that the clip was capable of holding more than thirty-one rounds of ammunition. A clip that holds more than thirty-one rounds of ammunition may be contraband. R.C. 2923.11(E) and (K); R.C. 2923.17(A). Deputy Phillips seized the clip, counted the rounds and concluded that it was capable of holding forty-eight or forty-nine rounds.

{¶15} Deputy Phillips then executed an affidavit for a search warrant. A search warrant was issued and another search of the Culgan residence revealed other contraband and evidence of crimes, which were seized and presented to the grand jury.

{¶16} On January 21, 2000, Culgan was charged with three counts of unlawful possession of dangerous ordnance in violation of R.C. 2923.17(A), and one count of possession of drugs in violation of R.C. 2925.11(A) and (C)(4)(a) (case No. 00–CR–0029). Culgan's motion to suppress all evidence seized as a result of the law enforcement officers' searches of his residence was denied.

{¶17} On June 22, 2000, Culgan was charged with having weapons while under disability in violation of R.C. 2923.13(A)(3) (case No. 00–CR–0327). Culgan was under a disability in Ohio because he had been convicted in *Commonwealth of Pennsylvania v. Culgan,* Allegheny County case No. 7603397, of possession of marijuana and/or possession of marijuana with intent to deliver. Culgan then filed a motion to suppress that was identical to the motion to suppress he filed in case No. 00–CR–0029. The trial court denied Culgan's motion to suppress in case No. 00–CR–0327, adopting its previous findings of fact and conclusions of law in case No. 00–CR–0029.

{¶18} The two cases were consolidated, and after initially pleading not guilty, Culgan changed his plea to "no contest" on both charges. The trial court found Culgan guilty of all charges and sentenced him to one hundred eighty days' imprisonment in the Medina County Jail for each case. The two sentences were ordered to run consecutively for a total jail term of 360 days.

{¶19} Culgan timely appealed, and has set forth two assignments of error for review.

*FIRST ASSIGNMENT OF ERROR*

{¶20} "[R.C.] 2929.16 does not authorize the court to impose consecutive six month jail terms."

{¶21} R.C. 2929.16 governs the imposition of residential community control sanctions for felony offenders who are not required to serve a mandatory prison term. Appellant has argued that R.C. 2929.16 does not authorize the trial court to impose consecutive six-month jail terms. This court disagrees.

{¶22} R.C. 2929.16(A) provides:

{¶23} "The court imposing a sentence for a felony upon an offender who is not required to serve a mandatory prison term may impose any community residential sanction or combination of community residential sanctions under this section. * * * Community residential sanctions include, but are not limited to, the following:

{¶24} "(1) A term of up to six months at a community-based correctional facility that serves the county;

{¶25} "(2) Except as otherwise provided in division (A)(3) of this section and subject to division (D) of this section, a *term of up to six months in a jail*[.]" (Emphasis added.)

{¶26} Appellant has argued that the court cannot impose consecutive sentences of residential community control under R.C. 2929.16(A) on a criminal defendant who has been found guilty of multiple felony offenses. To support his argument, appellant has relied on *State v. Lehman* (Feb. 4, 2000), Lucas App. No. L–99–1140, 2000 WL 125795. In *Lehman,* the Sixth District Court of Appeals reversed the four consecutive six-month jail terms that the trial court imposed upon the defendant-appellant pursuant to R.C. 2929.16(A) after finding her guilty of four separate felony offenses. Id. In so doing, the *Lehman* court found that the legislature intended the maximum term for a residential community control sanction to be six months, regardless of the number of felonies. Id. Under the *Lehman* court's analysis, any residential sanctions pursuant to R.C. 2929.16 for multiple offenses would have to be concurrent. See id. However, the decision of the Sixth District Court of Appeals is not binding on this court, and this court does not agree with the Sixth District's interpretation of R.C. 2929.16.

{¶27} The language of R.C. 2929.16 is unambiguous. R.C. 2929.16(A) refers to imposing a sentence for "a felony" in the singular. It logically follows that multiple residential community sanctions may be imposed where the criminal defendant has been found guilty of multiple felony offenses. This court does not believe that it was the intent of the legislature to limit the power of the sentencing court to a maximum sentence of six months regardless of the number of felonies of which a defendant was convicted.

{¶28} The language of R.C. 2929.16(A) also provides that the sentencing court may "impose any community residential sanction or combination of community residential sanctions under this section." Nothing in the language of R.C. 2929.16 prohibits a sentencing court from ordering that multiple residential community sanctions be served consecutively. Therefore, if a defendant were found guilty of multiple felony offenses, multiple periods of residential community control could be imposed, and the sentences could be ordered to be served consecutively.

{¶29} Appellant's first assignment of error is overruled.

## SECOND ASSIGNMENT OF ERROR

{¶30} "The court's decision overruling appellant's motion to suppress was contrary to the Constitutions of the United States and State of Ohio."

{¶31} In his second assignment of error, appellant has argued that Ptl. Ryba's initial entering of the Culgan's residence to look for appellant's daughter was an unlawful entry. Therefore, appellant has argued that the search warrant that was obtained subsequent to Ptl. Ryba's initial entry to search for appellant's daughter was invalid, and his motions to suppress should have been granted. This court disagrees.

{¶32} The decision to grant or deny a motion to suppress involves a question of law. Therefore, this court will review the trial court's judgment granting or denying the motion de novo. *State v. Russell* (1998), 127 Ohio App.3d 414, 416, 713 N.E.2d 56. See, also, *Ornelas v. United States* (1996), 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911. As stated in *Russell*, "[a]n appellate court must review the trial court's findings of historical fact only for clear error, giving due weight to inferences drawn from those facts by the trial court. The trial court's legal conclusions, however, are afforded no deference[.]" *Russell*, 127 Ohio App.3d at 416, 713 N.E.2d 56. In *State v. Cumberledge* (Sept. 16, 1998), Lorain App. No. 97CA006959, 1998 WL 646612, this court further noted:

{¶33} "When considering a motion to suppress, the trial court assumes the role of trier of fact and thus, stands in the best position to resolve issues of fact and witness credibility. Accordingly, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting such facts as true, this court must independently determine, as a matter of law, whether the facts meet the requisite legal standard." Id., quoting *Cuyahoga Falls v. Stephenson*, (June 18, 1997), Summit App. No. 18011, 1997 WL 379896.

{¶34} The Fourth Amendment of the United States Constitution guarantees certain protections to the citizens of the United States as follows:.

{¶35} "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

{¶36} Section 14, Article I of the Ohio Constitution, through almost identical language, provides these same protections to its people.

{¶37} However, the protections set out in the Fourth Amendment are not absolute.

{¶38} "The Ohio Supreme Court has explicitly recognized seven exceptions to the requirement that a warrant be obtained prior to a search. Those exceptions are '(a) [a] search incident to a lawful arrest; (b) consent signifying waiver of constitutional rights; (c) the stop-and-frisk doctrine; (d) hot pursuit; (e) probable cause to search, and the presence of exigent circumstances; * * * (f) the plain-view doctrine,' or (g) an 'administrative search.' *Although there is no precise list of all the exigent circumstances that might justify a warrantless search, exigent circumstances generally must include the necessity for immediate action that will 'protect or preserve life or avoid serious injury,' or will protect a governmental interest that outweighs the individual's constitutionally protected privacy interest[.]*" (Emphasis added and citations omitted.) *State v. Price* (1999), 134 Ohio App.3d 464, 467, 731 N.E.2d 280.

{¶39} In this case, the state has argued that exigent circumstances existed at the time Ptl. Ryba entered the Culgan residence, which allowed him to enter without first obtaining a warrant. This court agrees.

{¶40} Ptl. Ryba entered the Culgan residence because of his concern for appellant's daughter's safety and well-being. His concern was not unfounded. The appellant and Mrs. Culgan both lied about appellant's daughter being at her grandparents' house. The Culgans also lied about other people being in the dwelling. Ptl. Ryba also had reason to suspect that appellant's daughter was being exposed to illegal drug activity. Given the circumstances, it would not have been prudent for Ptl. Ryba to leave the Culgan residence and obtain a warrant. Appellant's daughter could have been removed from the Culgan residence and transported to an unknown location while Ptl. Ryba was attempting to obtain the warrant.

{¶41} This court finds that Ptl. Ryba's initial warrantless entry into the Culgan house to search for appellant's daughter was justified by exigent circum-

stances. Appellant's second assignment of error is overruled, and the judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

BATCHELDER, P.J., concurs.

WHITMORE, J., concurs in judgment only.