This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Andre Yeager has appealed from his convictions in the Summit County Court of Common Pleas for breaking and entering and receiving stolen property. This Court affirms.
 I
{¶ 2} In January and February 2002, Appellant and several co-defendants were indicted on numerous counts of breaking and entering, in violation of R.C. 2911.13(A); receiving stolen property, in violation of R.C. 2913.51(A); and engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1). Appellant pleaded not guilty to the counts as charged in the indictment, and the matter was set for trial. Prior to trial, Appellant filed a motion to suppress certain statements he made to police while in custody on the ground that he was not advised of his Miranda rights when the statements were made. After an evidentiary hearing, the trial court denied the motion. The trial court also denied Appellant's motion to sever the trial from that of his co-defendants, which had been filed on March 29, 2002.
{¶ 3} After the prosecution rested its case, the trial court dismissed several counts of the indictment. On April 24, 2002, the jury found Appellant guilty of breaking and entering, a felony in the fifth degree, as contained in counts five, nine, ten, and eleven of supplement two to the indictment. The jury also found Appellant guilty of receiving stolen property, a felony of the fourth degree, as contained in count twenty-four of supplement five to the indictment. However, Appellant was found not guilty of breaking and entering as contained in counts seven, eight, and twelve of supplement two to the indictment. The jury was deadlocked on the charges of breaking and entering and engaging in a pattern of corrupt activity, as contained in counts thirteen and sixteen, respectively, of supplement two to the indictment. The trial court then sentenced Appellant to a definite term of twelve months imprisonment on each count of breaking and entering and a definite term of eighteen months imprisonment for one count of receiving stolen property. The trial court ordered the sentences to be served consecutively, yielding a total of five and one-half years imprisonment. Appellant has timely appealed, asserting three assignments of error.
 Assignment of Error Number One "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS ALLEGED CONFESSION AS THERE WAS INSUFFICIENCE [SIC] EVIDENCE PRESENTED TO THE COURT TO ESTABLISH THAT APPELLANT WAS GIVEN HIS FULL MIRANDA RIGHTS AND THAT HE THEREAFTER KNOWINGLY AND VOLUNTARILY WAIVED THOSE RIGHTS."
{¶ 4} In Appellant's first assignment of error, he has argued that the trial court erred by denying his motion to suppress. Specifically, he has argued that the prosecution failed to establish that Appellant was advised of his Miranda rights, or that he made a voluntary and knowing waiver of those rights. We disagree.
{¶ 5} An appellate court's review of a motion to suppress presents a mixed question of law and fact. State v. Long (1998),127 Ohio App.3d 328, 332. In reviewing the trial court's findings of fact, an appellate court must give due weight to inferences drawn from those facts by the trial court because the trial court is in the best position to resolve questions of fact and evaluate the credibility of witnesses. State v. Hopfer (1996), 112 Ohio App.3d 521, 548, appeal not allowed (1996), 77 Ohio St.3d 1488ok. Accordingly, an appellate court reviews a trial court's findings of fact only for clear error. State v.Russell (1998), 127 Ohio App.3d 414, 416. A trial court's legal conclusions, however, are reviewed by an appellate court de novo. Id. at 416.
{¶ 6} Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694, provides that in order to protect a defendant'sFifth Amendment right against self-incrimination, statements resulting from custodial interrogations are admissible only after a showing that law enforcement officers have followed certain procedural safeguards.Miranda, 384 U.S. at 444. Specifically, an individual must be advised prior to custodial interrogation that 1) he has a right to remain silent, 2) any statement he makes may be used as evidence against him, and 3) he has a right to the presence of an attorney. Id.
{¶ 7} A defendant, may however, waive his Miranda rights, provided that such a waiver is knowingly, voluntarily, and intelligently made.Id. Further, it is the prosecution's burden to prove, by a preponderance of the evidence, that the defendant knowingly, voluntarily, and intelligently waived those rights based on the totality of the circumstances surrounding the investigation. State v. Gumm (1995),73 Ohio St.3d 413, 429, certiorari denied (1996), 516 U.S. 1177,116 S.Ct. 1275, 134 L.Ed.2d 221; Moran v. Burbine (1986), 475 U.S. 412, 421,106 S.Ct. 1135, 89 L.Ed.2d 410.
{¶ 8} Here, Appellant has argued that the state failed to establish that Appellant was administered Miranda rights before he made incriminating statements at the police station, and thus the statements should not have been admitted into evidence at trial. The sole testimony of a police officer, Appellant has argued, was insufficient to prove that Appellant knowingly and voluntarily waived his Miranda rights. Appellant has argued:
 "The mere assertion that the officer `read him his rights,' without evidence of what specific rights were explained to him, is insufficient to establish that Appellant was aware of each of the specific Constitutional safeguards he would be waiving by consenting to an interview, and therefore was insufficient to satisfy the state's `heavy burden' of proving a knowing and voluntary waiver of those rights."
{¶ 9} At the suppression hearing, Detective Vince Felber was the only witness to testify. During the prosecution's direct examination of Detective Felber, the following exchange took place:
"Q. [D]id you read [Appellant] his Miranda Rights?
"A. Yes, we did.
"Q. And where and when did you read him his rights?
"A. In the conference room of the sixth floor of the police station.
"Q. Okay. And did he indulge those, acknowledge those rights?
"A. Yes, he did.
 "Q. Did he appear to be under the influence of alcohol or drugs at that time?
"A. No, he did not.
"Q. After you read him his rights, did he speak with you?
"A. Yes, he did.
"Q. Did he waive his rights?
"A. Yes, he did."
{¶ 10} Appellant's counsel also questioned Detective Felber regarding the matter of Appellant's Miranda rights. During cross-examination, Appellant's counsel asked: "Now, I see you indicate or Detective Ball indicates in his report that in that paragraph that the interview begins that [Appellant] was read his Miranda warnings directly from department issued card; is that correct?" Detective Felber replied: "That's right."
{¶ 11} Although Detective Felber's testimony was the only evidence presented regarding Appellant's Miranda rights, we find that such unrebutted testimony was sufficient for the trial court to conclude that Appellant was read his Miranda rights and that he knowingly and voluntarily waived those rights. Furthermore, the prosecution did not have to prove that Appellant was informed of each individual right that he was waiving. It was enough that Detective Felber testified that Appellant was read his rights from a department issued card. See State v.White, 9th Dist. No. 21031, 2002-Ohio-6995, at ¶ 37 (holding that the testimony of two detectives stating that they read a defendant his Miranda rights from a standard card containing those rights constituted some competent, credible evidence to support the trial court's finding that the defendant was Mirandized prior to the police interview); Statev. Cartwright (Feb. 4, 2000), 2nd Dist. No. 17613, 2000 Ohio App. LEXIS 327, at *8 (holding that the testimony of an officer stating that a defendant was read his Miranda rights from a department issued card was sufficient to prove that the required warnings were given, effectively and expressly). Consequently, on the totality of these facts and circumstances, we cannot say that the trial court erred in concluding that Appellant was advised of his Miranda rights and that he knowingly and voluntarily waived those rights. Accordingly, Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two "THE TRIAL COURT ERRED IN ALLOWING STATEMENTS OF A CO-DEFENDANT TO BE INTRODUCED INTO EVIDENCE WHERE THAT CO-DEFENDANT DID NOT TESTIFY, IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS TO CONFRONT AND CROSS-EXAMINE WITNESSES AGAINST [SIC], UNDER THE RULE OF BRUTON v. U.S."
{¶ 12} In Appellant's second assignment of error, he has argued that the trial court erred by allowing the statements of a non-testifying co-defendant to be introduced into evidence, in violation of hisSixth Amendment right to confront and cross-examine the witnesses against him. We disagree.
{¶ 13} As an initial matter, we note that Appellant has failed to comply with App.R. 16(A)(3). That is, Appellant has failed to include "[a] statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected." Additionally, Appellant has failed to comply with App.R. 16(D) and Loc.R. 7(E). App.R. 16(D) provides in pertinent part: "References in the briefs to parts of the record shall be to the pages of the parts of the record involved[.]" Loc.R. 7(E) states:
 "References to the pertinent parts of the record shall be included in the statement of facts and in the argument section of the brief. If a party fails to include a reference to a part of the record that is necessary to the court's review, the court may disregard the assignment of error or argument. References must be sufficiently specific so as to identify the exact location in the record of the material to which the court must refer[.]"
{¶ 14} Because Appellant has failed to file a complying brief, this Court may disregard Appellant's second assignment of error pursuant to App.R. 12(A)(2). However, in the interests of justice, we will decide the assignment of error on its merits; we have located, and reviewed, the relevant portions of the trial transcript applicable to Appellant's arguments.
{¶ 15} The admissibility of statements made by non-testifying co-defendants is governed by the United States Supreme Court's decision in Bruton v. United States (1968), 391 U.S. 123, 88 S.Ct. 1620,20 L.Ed.2d 476. In Bruton, co-defendants, Evans and Bruton, were tried jointly on federal charges of armed postal robbery. A postal inspector testified that Evans confessed to the crime and told him that Bruton was his accomplice. Evans did not testify at trial. Bruton, therefore, did not have an opportunity to cross-examine Evans regarding the confession. The trial judge instructed the jury that the confession was admissible only against Evans and could not be considered in determining the guilt or innocence of Bruton because the confession was inadmissible hearsay. Despite the jury instruction, the Supreme Court held that the admission of the confession violated Bruton's Sixth Amendment right to confront the witnesses against him because Evans was not subject to cross-examination. Id. at 137. The court held that the violation could not be avoided by the trial court's instruction to the jury to disregard the confession with respect to Bruton. Id.
{¶ 16} The law in Bruton can best be expressed as: Any statements made by a non-testifying co-defendant that inculpates an accused are a violation of the accused's Sixth Amendment right to confront one's accusers, and such statements should be excluded from evidence. The Ohio Supreme Court has further explained that "[t]he Bruton rule applies with equal force to all statements that tend significantly to incriminate a co-defendant, whether or not he is actually named in the statement." (Quotations omitted.) State v. Mortiz (1980), 63 Ohio St.2d 150, 153. However, a violation of the Bruton rule:
 "`[D]oes not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.'" Mortiz, 63 Ohio St.2d at 153, quoting Schneble v. Florida (1972), 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340.
{¶ 17} Thus, pursuant to Mortiz, a violation of the Bruton rule is not prejudicial where there is sufficient independent evidence of an accused's guilt to render improperly admitted statements harmless beyond a reasonable doubt. Id., at paragraph two of the syllabus.
{¶ 18} In the instant case, Appellant was tried with two other co-defendants, Labron Yeager and John Watkins. Prior to trial, all parties agreed that any statements made by a co-defendant that inculpated another co-defendant would not be admitted into evidence. In an effort to comply with this agreement, the prosecution attempted to limit the answers elicited from its witnesses during direct examination. Specifically, the prosecution asked Detective Felber, who learned of Appellant's involvement with the cigarette robberies[1] from an interview he had with co-defendant Labron Yeager, not to discuss any names that Labron Yeager revealed during the course of the interview. Despite this request, however, the following exchange took place during the prosecution's direct examination of Detective Felber:
 "Q. How does this meeting [between you and Labron Yeager] then begin?
 "A. Well, first question I asked [Labron Yeager] is why does he want to talk to us and he'd given me an answer in the car, too, but I want to clarify it. And [Labron] said he was mad at [Appellant] because [Appellant] had taken [Labron's] son out."
"***
 "A. Said [Appellant] had taken [Labron's] son out and got [Labron's son] involved in the cigarette break-ins. [Labron] didn't want his son involved in the break-ins."
{¶ 19} The state has described Detective Felber's testimony regarding what Labron told him about Appellant as a "vague statement allegedly concerning [Appellant's] participation."[2] We disagree with the state's characterization of Detective Felber's statements. Detective Felber's testimony is a classic example of a Bruton violation. Although Detective Felber did not specifically testify that Labron said Appellant committed the cigarette robberies, it is evident that the detective's testimony regarding what Labron told him during the interview clearly implicated Appellant in the robberies. By allowing the detective to testify as to what Labron told him regarding Appellant's participation in the cigarette robberies, the trial court effectively allowed a statement of a co-defendant, Labron Yeager, which inculpated another co-defendant, Appellant, into evidence.[3] Since Labron Yeager did not take the stand, which would have provided Appellant with an opportunity to cross-examine Labron Yeager, such an admission was in violation of theBruton rule. We find, however, that the admission was harmless in light of the other evidence adduced at trial.
{¶ 20} At trial, Lamar Duffy, a witness who had been involved with the cigarette robberies and who had previously pleaded guilty to three counts of breaking and entering and one count of receiving stolen property for his part in the cigarette robberies, testified that he helped rob several businesses with Appellant in exchange for crack cocaine. He also testified that Appellant stole several cars during the commission of the cigarette robberies.
{¶ 21} Demetrius Yeager, Appellant's nephew and an accomplice in the cigarette robberies, testified that he was personally involved in several robberies with Appellant.
{¶ 22} In addition to the testimony of Demetrius Yeager and Lamar Duffy, was the testimony of Lieutenant Kenneth Ball. Lieutenant Ball testified that during an interview at the police station, Appellant confessed to taking part in at least three of the robberies for which he was charged.
{¶ 23} As the evidence overwhelmingly shows that Appellant committed several of the robberies for which he was charged, this Court finds that the admission of the co-defendant's statement was harmless error. Consequently, Appellant's second assignment of error is not well taken.
 Assignment of Error Number Three
"APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE." {¶ 24} In Appellant's third assignment of error, he has argued that his convictions were against the manifest weight of the evidence. We disagree.
{¶ 25} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
 "[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
{¶ 26} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id.
{¶ 27} Appellant was convicted of four counts of breaking and entering, in violation of R.C. 2911.13(A), which provides: "No person by force, stealth, or deception, shall trespass in an unoccupied structure, with purpose to commit therein any theft offense, as defined in [R.C.2913.01], or any felony." The prosecution had to prove beyond a reasonable doubt that Appellant violated R.C. 2911.13(A) when he allegedly robbed 1) Chas' Convenient Mart, located on 1216 Arlington Road; 2) a Holland Oil, located on 444 South Maple Street; 3) an American Cash Exchange, located on 1544 South Hawkins; and 4) Gas and Oil, located on 745 East Archwood.
{¶ 28} Appellant was also convicted of receiving stolen property, in violation of R.C. 2913.51(A), which provides: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." The state had to prove beyond a reasonable doubt that Appellant received or used a stolen 1997 Pontiac Transport van.
{¶ 29} At trial, Lamar Duffy, a friend of Labron Yeager, admitted that he was involved in three of the cigarette robberies with Appellant. He testified that he was at a bus station when he first met Appellant on December 21, 2001. The two men talked, and later both men left the bus station for Labron Yeager's home located on 997 Peerless Street, in Akron, Ohio. While at Labron's home, Lamar testified that Appellant told him that "well, we going to hit a lick," or "steal something." Lamar stated that Appellant then left the house and returned with a blue van. Appellant, accompanied by Lamar and a third man known as "Big Red," drove to American Cash Exchange, located on 1544 South Hawkins Street, in Akron, Ohio. Lamar further testified that once at American Cash Exchange, Big Red threw a brick through the window and the men entered the store. Big Red and Lamar then loaded an ATM onto a dolly and placed the ATM in the back of the van driven by Appellant. The three men did not get far with the ATM, however. Lamar explained that Appellant inadvertently stepped on the gas pedal, which caused the van to lurch forward and the ATM fell out of the van into the parking lot. They did not attempt to retrieve the ATM.
{¶ 30} Lamar further testified that after the botched attempt to steal the ATM from American Cash Exchange, the three men returned to Labron's home on Peerless Street. The men did not stay at Labron's for long. Lamar testified that Appellant left the home and returned with a white van. The two men (Big Red stayed at Labron's home during the second robbery) then drove to a Holland Oil gas station later that night. Lamar stated that Appellant backed the van through the front doors of the gas station. Lamar jumped out of the van, loaded several garbage cans with cartons of Newport cigarettes, and placed the garbage cans in the back of the van. In exchange for his help with both robberies, Lamar testified that Appellant gave him crack cocaine.
{¶ 31} Kim Salzwimmer, a store manager at American Cash Exchange, and Daryl Paris, a district manager for Holland Oil located on 444 South Maple Street, corroborated Lamar's testimony regarding the night of December 21, 2001. Both managers testified that their stores were broken into on the night of December 21, 2001. Although Salzwimmer was unable to identify any of the robbers, she testified that an ATM was found in the middle of the parking lot of American Cash Exchange, along with a dolly and a pair of gloves. Paris testified that the front doors of the Holland Oil were damaged and that the thieves stole cartons of Kools and Newport cigarettes, the same brand Lamar testified Appellant told him to steal.
{¶ 32} In addition to the testimony concerning the robberies that occurred on December 21, 2001, Lamar testified to a robbery that occurred on December 23, 2001. He stated that after the robberies on December 21, 2001, he drove to Cleveland to stay with his mother. Lamar decided to return to Akron on December 23, 2001, because "[he] knew [Appellant] had crack." Once he was back in Akron, he went to Labron's home on Peerless Street where he met Appellant. Lamar testified that Appellant told him "[w]ell, I got another lick up," which Lamar believed meant, "[w]e was going to try to do the same thing all over again." Lamar stated that he agreed to rob more cigarettes from stores in exchange for more crack cocaine.
{¶ 33} Lamar testified that on the night of December 23, 2001, Appellant left the home on Peerless Street and returned with a "red-bubble shaped van." The two men drove to a "garage-like, auto body," where Appellant stole an orange dolly and placed it in the van. From there, the men drove to Gas and Oil gas station to steal an ATM. Lamar testified that Appellant backed the van into the doors of the gas station and the two men entered the store. Once in the store, they placed the stolen dolly underneath the ATM, but because the ATM was bolted to the floor, they were unable to steal it, so they left. Lamar stated that while driving away from the Gas and Oil, the men were followed by the police. Lamar further testified that Appellant pulled the van over and fled; Lamar, however, was unable to run because he was "just stuck." Lamar was subsequently arrested.
{¶ 34} Brenda McGee, a district manager at Gas and Oil, located on 745 East Archwood, Akron, Ohio, corroborated Lamar's testimony concerning the night of December 23, 2001. She testified that the Gas and Oil was broken into on December 23, 2001, and that the doors of the store were "busted" open and cigarettes were stolen. McGee further stated that a dolly was found sitting in front of the store's ATM. Video surveillance showed two figures running from the store, but McGee was unable to identify the two figures.
{¶ 35} Additionally, Lloyd Hilton, an employee of Jordan Motors (a used car dealership), corroborated Lamar's testimony regarding the stolen van driven by Appellant on December 23, 2001. Mr. Hilton testified that a Pontiac Transport van was stolen from the car lot on December 23, 2001. When the van was later recovered in Cleveland, Hilton testified that the steering column was "busted," there was rear quarter panel damage, and some bumper damage.
{¶ 36} Demetrius Yeager, Appellant's fifteen-year-old nephew, presented testimony regarding the February 28, 2001 robbery of Chas' Convenient Mart, located on 1216 South Arlington Road, Akron, Ohio. Demetrius testified that he, along with Appellant and a young man named "Jose," drove to Chas' Convenient Mart. Demetrius threw a brick threw the window of the store, and then he and Appellant ran inside. Once inside the store, the men began stealing cartons of Newport cigarettes. With the stolen cigarettes loaded into a stolen car, the men drove back to Demetrius' grandmother's home and put the cigarettes in her garage. Although Demetrius did not see Appellant remove the cigarettes from the garage and sell them, and he could not remember how much money he received for helping Appellant rob the convenient store, he testified that he would occasionally receive money from Appellant for his part in the robberies.
{¶ 37} Demetrius' testimony regarding the events that took place on February 28, 2001, was corroborated by the testimony of David Racklaw, the store manager of Chas' Convenient Mart. Racklaw testified that the front window of the store was busted out with a brick and cartons of Newport and Camel cigarettes were stolen.
{¶ 38} Although it appears that Demetrius Yeager and Lamar Duffy were offered lighter sentences in return for the testimony at trial, thereby giving them a possible motive to implicate Appellant in the crimes, the credibility of the witnesses is for the jury to decide. "Credibility is a question of fact to be determined by the jury and a reviewing court should not substitute its judgment for that of the jury."State v. Walker (1978), 55 Ohio St.2d 208, 212, certiorari denied (1979), 441 U.S. 924, 99 S.Ct. 2033, 60 L.Ed.2d 397. The jury is in the best position to view the witnesses' testimony and adjudge their credibility. Further, this Court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless we conclude that the factfinder clearly lost its way. In re Lieberman
(1955), 163 Ohio St. 35, 38.
{¶ 39} After reviewing the testimony presented at trial, however, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Appellant of breaking and entering and receiving stolen property. Therefore, Appellant's third assignment of error is not well taken.
 III
{¶ 40} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
SLABY, P.J. and BATCHELDER, J. CONCUR
[1] Appellant and several co-defendants broke into area businesses with the intent of stealing cartons of brand name cigarettes and/or automatic teller machines ("ATM"). During the commission of some of these break-ins, Appellant stole several vehicles. The criminal activity for which Appellant was convicted is referred to as the "cigarette robberies."
[2] After the prosecution rested its case, Appellant's counsel made objections on the record. Specifically, Appellant's counsel objected to Detective Felber's statement concerning Labron's anger at Appellant for getting Labron's son involved in the cigarette robberies. Apparently, the prosecution told Detective Felber beforehand that he could properly testify to what Labron told him about Appellant. The prosecution explained: "[I]t was my belief, based on legal knowledge and reviewing the cases of Bruton that the statement was not going to the heart of accusing him of things, that the statement was his motive, Labron Yeager's motive, for telling on [Appellant]."
[3] Appellant's counsel objected to Detective Felber's testimony, but the trial court overruled the objection.