Decision and Journal Entry
{¶ 1} Defendant, Derrick Mitchell, appeals from the judgment of the Summit County Court of Common Pleas which convicted him of aggravated robbery with a firearm specification. We affirm.
{¶ 2} On June 3, 2002, Defendant was arrested and charged with aggravated robbery, in violation of R.C. 2913.01, and one firearm specification, in violation of R.C. 2941.145. Defendant was seventeen years old at the time of his arrest.
{¶ 3} Thereafter, a probable cause hearing was conducted by the Juvenile Division of the Summit County Court of Common Pleas. Upon finding probable cause that Defendant was involved in the commission of the charged offenses, the court transferred the matter to the Summit County Court of Common Pleas.
{¶ 4} On July 2, 2002, Defendant was indicted with one count of aggravated robbery, in violation of R.C. 2911.01(A)(1) with a firearm specification. Defendant then filed a motion to suppress eyewitness identification and oral statements. The motion was denied.
{¶ 5} Thereafter, a jury trial was held. Defendant was found guilty of both charges and sentenced accordingly. Defendant timely appeals raising two assignments of error for review.
 ASSIGNMENT OF ERROR I "The trial court erred in denying [Defendant's] Motion to Suppress the Eyewitness Identification of [Defendant] because the show up procedure was inherently suggestive and there is a very substantial likelihood of irreparable misidentification."
{¶ 6} In his first assignment of error, Defendant asserts that the trial court erred when it denied his motion to suppress. Defendant maintains that the identification procedure was inherently suggestive thus resulting in a substantial likelihood of misidentification. We disagree.
{¶ 7} A trial court makes both factual and legal findings when ruling on a motion to suppress. State v. Jones, 9th Dist. No. 20810,2002-Ohio-1109, at ¶ 9. Accordingly, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v. Hopfer
(1996), 112 Ohio App.3d 521, 548, quoting State v. Venham (1994),96 Ohio App.3d 649, 653. An appellate court, therefore, is bound to accept a trial court's factual findings that are supported by competent, credible evidence. State v. Searls (1997), 118 Ohio App.3d 739, 741;State v. Guysinger (1993), 86 Ohio App.3d 592, 594. However, the trial court's application of law to the factual findings is reviewed de novo on appeal. State v. Russell (1998), 127 Ohio App.3d 414, 416. See, also,Ornelas v. United States (1996), 517 U.S. 690, 699, 134 L.Ed.2d 911.
{¶ 8} A suggestive confrontation increases the likelihood of misidentification. State v. Parker (1990), 53 Ohio St.3d 82, 87. Due process requires that a pre-trial identification be suppressed if the procedure employed was unnecessarily suggestive of the suspect's guilt and the identification was unreliable based upon the totality of the circumstances. State v. Brown (1988), 38 Ohio St.3d 305, 310. Thus, "[a]n unnecessarily suggestive identification process does not violate due process if such identification possesses sufficient indicia of reliability." Parker, 53 Ohio St.3d at 87, citing Manson v. Brathwaite
(1976), 432 U.S. 98, 106, 53 L.Ed.2d 140. Key factors in determining reliability are the "witness's opportunity to view [the suspect] during the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the witness's certainty, and the time elapsed between the crime and the identification." State v.Waddy (1992), 63 Ohio St.3d 424, 439.
{¶ 9} In the present matter, the evidence indicates that the victim, Paula Hornbeck ("Hornbeck"), on her own initiative, identified Defendant as her assailant shortly before he was apprehended. This identification was made under circumstances that were not impermissibly suggestive. Additionally, the physical description Hornbeck provided was accurate and she was certain in her identification of Defendant.
{¶ 10} At the motion to suppress hearing, Detective Richard Morrison testified that he arrested Defendant after receiving a detailed description of his whereabouts and physical appearance from Hornbeck, which had been relayed to him by his secretary. The description was that of a young black male with braided hair wearing dark clothing and white tennis shoes. Hornbeck indicated that the suspect was standing outside the vicinity of her apartment on Lakeshore Boulevard with a group of five to ten other males. Detective Morrison responded to the area. He explained that, as he approached, the white shoes played a pivotal role in identifying the described suspect. No other individual was wearing predominantly white shoes. As Detective Morrison exited his unmarked police cruiser Defendant began to run. Detective Morrison pursued Defendant and apprehended him shortly thereafter. Defendant was then handcuffed and placed in a law enforcement vehicle.
{¶ 11} Meanwhile, Sergeant Graham transported Hornbeck to the scene so that she could verify that the individual in custody was in fact her assailant and the one whom she had earlier identified as the suspect. Although Hornbeck did not leave the cruiser, she made a positive identification of Defendant. Sergeant Graham indicated that upon seeing Defendant, Hornbeck became very upset and exclaimed "[t]hat's him. Oh my God. I'm sure that's him. He's going to kill me."
{¶ 12} Upon review, we conclude that Hornbeck's initial identification of Defendant was made under circumstances that were not impermissibly suggestive. Therefore, there are sufficient indicia of reliability. The second identification was made shortly after Hornbeck informed law enforcement authorities that she observed Defendant, her assailant, standing outside her apartment complex. When the authorities went to investigate, Defendant gave chase. Shortly thereafter, he was subdued and taken into custody. Only then was Hornbeck transported to the scene in order to verify that authorities apprehended the correct individual, the one whom she previously described and identified as her assailant. Thus, in this instance we do not find that the introduction of evidence of the show-up was in error. Although the show-up was not, as the trial judge acknowledged, "the best practice," based on the factors of the case the totality of the circumstances indicate reliability. SeeParker, 53 Ohio St.3d at 87. Accordingly, Defendant's first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "The jury erred in finding [Defendant] guilty of [a]ggravted [r]obbery and a [g]un [s]pecification because said findings of guilt were against the manifest weight of the evidence presented at trial."
{¶ 13} In his second assignment of error, Defendant maintains that his convictions for aggravated robbery and the firearm specification were against the manifest weight of the evidence. Defendant's argument lacks merit.
{¶ 14} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing State v. Thompkins (1997), 78 Ohio St.3d 380,390 (Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
{¶ 15} In the present matter, Defendant was found guilty of, and appeals his convictions for, aggravated robbery with a firearm specification. Aggravated robbery is defined as having a deadly weapon on or about the offender's person or under the offender's control and either displaying, brandishing, using or indicating that the offender possesses the weapon in attempting or committing a theft offense or in fleeing after the attempt or commission. R.C. 2911.01(A)(1). A firearm specification may be contained in the indictment when the offender "had a firearm on or about [his] person or under [his] control while committing the offense" and the weapon was brandished, displayed, used, or referred to in the commission of the offense. See R.C. 2941.145(A).
{¶ 16} At trial, Hornbeck recalled the events of June 1, 2002. That morning, she and her boyfriend, Anthony Mignano ("Mignano"), awoke at 7:15 a.m. Mignano was running late for work and Hornbeck went to call his boss and let him know that Mignano would arrive shortly. Hornbeck maintained that she used an outside payphone to place the call because the cordless telephone in her apartment was uncharged and therefore could not be used. Hornbeck testified that she walked an estimated one hundred yards to the payphone and then called Mignano's boss. As she placed her coins into the phone, Hornbeck explained that she was approached by Defendant. Defendant pointed a nine millimeter gun in her direction and asked for her money. She asserted that Defendant then reached into her pocket and took the money, despite the fact that she had previously testified in a prior hearing that she had given Defendant her money after he made his request. Hornbeck then ran home to her apartment. She stated that Defendant began shooting when she started running. Hornbeck estimated that Defendant was in the vicinity of apartments 1118 and 1120 when he fired an estimated six or seven shots.
{¶ 17} When Hornbeck arrived at her apartment, she hurriedly informed Magnano of what had occurred. Hornbeck alleged that she then borrowed her neighbor's phone, plugged it in at her apartment, and called 9-1-1. She testified that, to her knowledge, Magnano remained at the apartment to wait for the police and did not leave to go search for the assailant. While she was speaking with the dispatcher, Hornbeck observed Defendant enter apartment 1112 or 1120 Lakeshore Boulevard. She gave a description of her assailant to the police. However, no arrests were made that day.
{¶ 18} Two days later, Hornbeck received a call from Victim's Assistance. While speaking on the phone, Hornbeck again observed Defendant standing outside of unit 1120 or 1122. She identified Defendant as the assailant and provided a description of him, which was then relayed to the police. Hornbeck indicated that the suspect was a black male with braided hair, wearing all black clothing and white tennis shoes. Thereafter, authorities arrived on the scene. Initially, Hornbeck was able to observe the officers chase Defendant, however, they then ran behind a building and she lost sight of them. Hornbeck recalled that a few moments later, an officer arrived at her apartment and asked her to go verify that the individual in custody was in fact the man she identified as her assailant. Hornbeck explained that when she saw the individual they had apprehended, she "freaked out[.]" She identified him as the assailant and expressed fear that Defendant and his friends would now seek her out and kill her.
{¶ 19} Mignano offered a somewhat different account of the days events. Mignano testified that he was already in his car when he heard between five to seven gunshots. He then exited his car and began walking through the parking lot when Hornbeck came running up to him screaming that she had been robbed. Mignano told her to call 9-1-1. He maintains that he then drove around the complex and saw Defendant and another black male standing beside an apartment building. Mignano asserted that as he slowed his vehicle, Defendant pointed a gun in the air but did not fire. He maintained that the officer's report, which indicates that Mignano previously stated he was fired at, was inaccurate. Mignano testified that he did not inform Hornbeck that he went to look for her assailant. Additionally, we note that both Mignano and Hornbeck denied that a failed drug deal played a role in the events that occurred.
{¶ 20} Detective Morrison also testified at trial. He responded to the scene on June 1, 2002. While speaking with Hornbeck, she provided him with a description of her assailant: young black male, roughly 18 years of age, five and a half feet in height, dark clothing and braided hair. Detective Morrison then went to apartment 1112 as Hornbeck believed Defendant had entered that unit. Two females greeted the officer at the door. When asked if anyone else was present, they responded in the affirmative and then went to retrieve Defendant. Detective Morrison testified that Defendant met the description Hornbeck had provided. He briefly spoke with Defendant, who denied any involvement in the robbery. Detective Morission stated that he then left after receiving a report of a nearby stabbing. No arrests were made that day. Detecitve Morrison testified that he arrested Defendant two days later in the vicinity of the apartment complex. The arrest was made after receiving a report from Hornbeck that her assailant was standing outside her apartment on Lakeshore Boulevard.
{¶ 21} Addtionally, Officer Mark Hackman ("Hackman") stated that after he canvassed the area where the shots were alleged to have been fired, three "9 m.m." shot casings were recovered. Officer Hackman admitted, however, that the casings were not fingerprinted and he was unable to tell when they were actually expelled from a firearm.
{¶ 22} Sergeant Graham, was on duty June 3, 2002, and, via his radio, learned of the foot pursuit of Defendant. When Sergeant Graham arrived on the scene, Defendant had already been apprehended. He stated that he was responsible for transporting Hornbeck to the place of Defendant's arrest and witnessed her identify Defendant as the assailant. Sergeant Graham recalled that upon seeing Defendant, Hornbeck was visibly shaken and began crying. He testified that she exclaimed Defendant would kill her.
{¶ 23} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Defendant of aggravated robbery. Although conflicting and somewhat inconsistent testimony was presented, we refrain from overturning the verdict because the jury chose to believe one version of events as opposed to another. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony." State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Although Hornbeck and Mignano offered varying versions of events, the evidence presented indicating that Hornbeck was robbed by a man she identified as Defendant was uncontroverted. Accordingly, Defendant's convictions were not against the manifest weight of the evidence. Defendant's second assignment of error is overruled.
{¶ 24} Defendant's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.