**CITY OF AKRON, Appellee,**

v.

**CALLAWAY, Appellant.**

[Cite as *Akron v. Callaway,* 160 Ohio App.3d 229, 2005-Ohio-1471.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22018.

Decided March 30, 2005.

230

J. Dean Carro, for appellant.

Max Rothal, Akron Law, Director, Douglas J. Powley, Chief City Prosecuting Attorney, and Gerald L. Larson, Assistant Prosecuting Attorney, for appellee.

BATCHELDER, Judge.

{¶ 1} Appellant, William E. Callaway, appeals from his conviction in the Akron Municipal Court for obstructing official business and resisting arrest. We affirm in part and reverse in part.

I

{¶ 2} On July 18, 2004, the Akron Police Department received a nonemergency call from Alan Bailey of the Summit County Adult Protective Services, requesting law enforcement and EMS to conduct a "welfare check" at 718 Sylvan Avenue in Akron, Ohio, regarding the health of an elderly, bedridden male at that residence, namely, William's father, Walter Callaway. Bailey informed the police department that he had received information from a physician's office that several calls had been made from the Callaway residence. At no time during his conversation with the police dispatcher did Bailey mention that the calls from the physician's office suggested a medical emergency, and the dispatcher never mentioned to the

officer who was to follow up on this call, Officer Alan Hamidi, that this phone call indicated an emergency.

{¶ 3} When asked to confirm whether he just wanted someone to check to make sure Walter was all right, Bailey explained the predicament as follows:

Yeah, it's one step above that. I don't think (inaudible) because this is secondhand. We have a history of some kind of situation. [Walter] is, oh he's 81, but he does have need at times for IV. He has dementia and is not compliant with either his diet, he could be dehydrated, he could be in need of an IV. He has a son that seems quite, admit there's a history of some overreacting. He's been calling a health agency, actually a Dr. Scroggins is his attending physician. He's been calling there about every few hours to say his dad needs help. He won't take his father to a hospital for fear his father will be put in a nursing home. Okay. I think this is (inaudible) my opinion, but it's shared, it's shared. The son may not be accurate as concerned because he's a little (inaudible). But there are medical situations the father is in.

\* \* \*

There's an adult there with Walter, that's the son. He just called minutes ago to the doctor while I was talking to the doctor's receptionist requesting medical attention again for his father. We're not medical professionals who go out there. So that's why I thought I'd call to you.

{¶ 4} Without a warrant, Officer Hamidi went to the Callaway residence, dressed in uniform, and knocked on the side door of the house. William looked out the window but did not notice a marked police car near the house. William then opened the door to see who was there, at which point the officer identified himself and informed William that he was sent there by Adult Protective Custody to follow up on a call. At his trial, William testified that the officer had told him that the call had indicated that an elderly man at that location was being abused, that both the police and the EMS were being sent to the house, and that they actually needed to physically see Walter to make sure that he was all right. William responded that Walter was fine and that the officer was misinformed regarding any sort of abuse.

{¶ 5} The officer testified at trial that William "seemed to get really agitated" and that he began to pace back and forth behind the door. The officer testified that William then told the officer that he had not called the police and that the officer was not welcome there and "turned around abruptly to go back towards the door to go back inside the house." Before William could reenter the house, the officer insisted that he needed to come in the house to see Walter and warned William that if he resisted his entrance, he would arrest him for obstructing official business. The officer testified that William then "clipped [the officer] on the right shoulder, and [said], 'no police coming in here and do nothing.'" The

officer testified that he then informed William that he was under arrest for obstructing official business and instructed William to put his hands behind his back. At trial, William denied hitting the police officer and asserted that the officer never actually started to place him under arrest outside of the house.

{¶ 6} Nevertheless, both William and the officer testified that William then darted toward the partially opened door to go inside the house and attempted to shut the door behind him. The officer testified that he had held onto the partially fastened handcuffs, following William into the house. The entire time, the officer used pressure points on William's elbow to make him comply, but to no avail; William proceeded into the house, with the officer holding on to him, and moved toward the kitchen. The officer then began to apply knee strikes to William's thigh, which did not make William acquiesce, either. The officer maintained that he continued to tell William that he was under arrest and that he needed to stop moving.

{¶ 7} William proceeded into the kitchen toward the telephone. He dialed 911, insisting that he was going to call the officer's supervisor; all the while, the officer was striking him on the knee. The officer stated that he then noticed that William was holding the phone above his head, a pose that apparently indicated to the officer that he was about to be struck with the phone. The officer pulled back from William but then attempted to immobilize him with a taser-gun shot to the chest. After a second shot, the taser successfully immobilized William and brought him to the ground.

{¶ 8} After the officer successfully apprehended William, he called for backup. Then, EMS arrived on the scene.[1] The officer did eventually proceed upstairs to check on Walter; he found him lying on a hospital bed. Walter told the officer that he was fine.

{¶ 9} William was charged with one count of obstructing official business in violation of Akron Codified Ordinance 136.11, a second-degree misdemeanor, and one count of resisting arrest in violation of Akron Codified Ordinance 136.13, a first-degree misdemeanor. William pleaded not guilty to the charges.

{¶ 10} The case proceeded to a jury trial. At the close of the city's case and at the close of all the evidence, William's counsel moved for a judgment of acquittal pursuant to Crim.R. 29(A). The court denied the motions. A jury found William guilty of both charges, and the trial court sentenced him accordingly. The trial court stayed William's sentence pending appeal.

---

1. The officer also encountered William's brother, Walter Callaway Jr., during this series of events inside the residence. The two engaged in a scuffle, and Walter Jr. was also eventually charged.

{¶ 11} William filed a pro se notice of appeal to this court from his conviction and sentence. Thereafter, appellate counsel was appointed to represent him, and William thereby asserts two assignments of error for review.

## II

### A

#### First Assignment of Error

The city of Akron failed to prove beyond a reasonable doubt all elements of the crime of obstructing official business. Specifically, the city failed to prove that appellant Callaway acted "without privilege" in refusing police entry to his home when the police had no warrant and no exigent circumstances. The city also failed to prove an authorized act and a lawful duty. The failure of proof beyond a reasonable doubt on all elements violated appellant Callaway's right to due process of law under the Due Process Clause of the Fourteenth Amendment.

{¶ 12} In his first assignment of error, William contends that the state failed to prove beyond a reasonable doubt all elements of the offense to obstructing official business. Thus, William maintains that his conviction for obstructing official business was not supported by sufficient evidence. We agree.

{¶ 13} "The test for 'insufficient evidence' requires the court to view the evidence in the light most favorable to the prosecution, and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Leggett* (Oct. 29, 1997), 9th Dist. No. 18303, at 4, 1997 WL 775688. We must determine whether, as a matter of law, the evidence was legally sufficient to support a conviction. Id. "In essence, sufficiency is a test of adequacy." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

{¶ 14} William maintains that the state failed to establish that he acted without privilege in refusing police entry into his father's home and that the police officer was engaged in an authorized act and lawful duty at the time. William was convicted of obstructing official business in violation of Akron Codified Ordinance 136.11, which provides, "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties." The police officer in this case appeared at the residence without a warrant. The Fourth Amendment confers the constitutional right upon a defendant to refuse to consent to a warrantless entry, and the assertion of this right cannot be a crime.

*Camara v. Mun. Court* (1967), 387 U.S. 523, 530–540, 87 S.Ct. 1727, 18 L.Ed.2d 930.

{¶ 15} The state responds that William cannot assert a privilege because he did not have a reasonable expectation of privacy in his father's home and because the evidence does not establish that he was an overnight guest or otherwise had any proprietary interest in the home. The Fourth Amendment protects against unreasonable intrusions into an area in which the individual attempting to invoke the Fourth Amendment protection has an actual subjective expectation of privacy, which, when viewed objectively, is justifiable under the circumstances of the case. *State v. Robinson* (1995), 103 Ohio App.3d 490, 494, 659 N.E.2d 1292, citing *Smith v. Maryland* (1979), 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220. William maintains that he was an invited guest at his father's home, and that he has sufficient contact and control over Walter's residence to create a legitimate expectation of privacy in the home. A host's ultimate control of his home does not obviate the possibility that a guest in his home may have a legitimate expectation of privacy even though the guest does not have a legal interest or authority to determine who enters the home. *Minnesota v. Olson* (1990), 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85. "A subjective expectation of privacy is legitimate if it is ' "one that society is prepared to recognize as 'reasonable.' " ' " Id. at 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85, citing *Katz v. United States* (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. William maintains that his expectation of privacy in his father's home is one that society would be willing to recognize as legitimate and thus is protected by the Fourth Amendment.

{¶ 16} William does not live with Walter. However, the nature of the time he spends at Walter's home is closer in character to that of an overnight guest. William has the responsibility of providing Walter's home care. William comes to the home to take care of Walter, with whom he has a strong relationship. Furthermore, William's care-giving responsibilities to Walter and Walter Jr. necessitate that he spend frequent and lengthy periods at the home. Walter has dementia, is bedridden and cannot walk, and has difficulty feeding and cleaning himself. Additionally, William watches over his brother, Walter Jr., who has a mental disorder and lives with his bedridden father. William was not at the home to pursue some sort of business venture or for his own use; rather, he was there because he played an integral role in Walter's well being and survival. Cf. *Minnesota v. Carter* (1998), 525 U.S. 83, 91, 119 S.Ct. 469, 142 L.Ed.2d 373. Thus, we disagree with the state's position and conclude that William did indeed have a reasonable expectation of privacy in his father's home.

{¶ 17} Although William did not protest the officer's presence at his front door, his subsequent attempt to close the door constituted an exercise of his privilege to refuse entry and the termination of any consensual encounter. See, e.g., *State v. Cummings* (Jan. 16, 2002), 9th Dist. No. 20609, 2002 WL 57979, at *11. Without a warrant, the officer needed more than the mere possibility of harm to justify entering over William's objection. The police officer conceded at trial that he did not have knowledge of whether the phone call received by the dispatcher had been verified for legitimacy. There is no indication that an inquiry was made into the reliability of the informant who made the call. William insisted that he was not the one who had called EMS or the police initially; he noted that there was a possibility that either Walter or Walter Jr. may have tried to contact EMS.

{¶ 18} It is clear that an emergency did not exist at the residence; the call did not suggest that there was an imminent need to save a life or avoid serious injury. See *State v. Applegate* (1994), 68 Ohio St.3d 348, 349, 626 N.E.2d 942. While the EMS was dispatched to the scene as well, it did not arrive until after the police officer had already encountered William and had engaged him in what became an argumentative conversation and physical struggle. While the police officer did eventually make his way up to the second floor to see Walter, once he got to Walter, he could do no more than simply *ask* Walter whether he was all right. The police officer did not examine him or ask him any medical questions, and rightly so; such a task was appropriately left to the EMS to handle. Given the information relayed to the officer, there was no emergent medical need that he could satisfy. Furthermore, other than William's nervous pacing back and forth in front of the door while contemplating how to handle the police officer's presence, there is nothing in the testimony to indicate that anything suspicious or criminal was occurring at the residence.

{¶ 19} Another officer who had been at the scene testified as to the commonality of answering calls to check someone's welfare. Certainly, if a call is made that indicates a medical emergency or the possibility of imminent death, such a situation may warrant taking any action necessary to enter the home and check the individual. However, that scenario was not present here. Walter was not alone. He was being attended to by William, who attested to his father's physical state and, as even the caller had stated, had made calls to Walter's physician to seek medical help. Cf. *State v. Russell* (1998), 127 Ohio App.3d 414, 418, 713 N.E.2d 56 (no response when law enforcement knocked on the door of a missing person). William testified that the family frequently made calls to Walter's physician for medical assistance. William did testify that no one in the family made a call to the doctor the day the officer came to the house.

{¶ 20} Based upon the foregoing, we conclude that the state failed to establish beyond a reasonable doubt that William was acting without a privilege and that the police officer's entry into the home was lawful. See *Leggett*, 9th Dist. No. 18303, at 3–4; Akron Codified Ordinance 136.11. Therefore, we find that William's conviction for obstructing official business is not supported by sufficient evidence. Accordingly, William's first assignment of error is sustained.

## B

### Second Assignment of Error

The city of Akron violated Section 3, Article XVIII, of the Ohio Constitution when it enacted Akron Codified Ordinance § 136.13 [resisting arrest] as it conflicts with R.C. § 2921.33 in permitting convictions where the arrest was not proven to be lawful. Since the Akron ordinance under which appellant Callaway was convicted is unconstitutional, his conviction was void.

{¶ 21} In his second assignment of error, William asserts that Akron Codified Ordinance 136.13 is unconstitutional because it is in conflict with R.C. 2921.33, resisting arrest, and that therefore, his conviction for resisting arrest is void.

{¶ 22} William presents a constitutional challenge that he did not raise at the trial court level and that he therefore did not properly preserve for appeal. "Constitutional rights may be lost as finally as any others by a failure to assert them at the proper time. * * * Accordingly, the question of the constitutionality of [an ordinance] must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court." *State v. Awan* (1986), 22 Ohio St.3d 120, 122, 22 OBR 199, 489 N.E.2d 277. Because William raises this issue for the first time on appeal, we decline to address it. See id. at syllabus. William's second assignment of error is overruled.

## III

{¶ 23} William's first assignment of error is sustained. William's second assignment of error is overruled. The conviction in the Akron Municipal Court is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this decision.

Judgment affirmed in part,
reversed in part,
and cause remanded.

WHITMORE, P.J., and MOORE, J., concur.