**CITY OF AKRON, Appellee,**

v.

**CALLAWAY, Appellant.**

[Cite as *Akron v. Callaway,* 162 Ohio App.3d 781, 2005-Ohio-4095.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 22018.

Decided Aug. 10, 2005.

784

Max Rothal, Director of Law, Douglas J. Powley, Chief City Prosecutor, and Gerald K. Larson, Assistant City Prosecutor, for appellee.

J. Dean Carro, Appellate Review Office, the University of Akron, School of Law, for appellant.

---

BATCHELDER, Judge.

{¶ 1} This matter is before the court upon reconsideration of *Akron v. Callaway* (2005), 160 Ohio App.3d 229, 2005-Ohio-1471, 826 N.E.2d 879. The court, having vacated its prior decision and journal entry, reconsiders its decision and journal entry upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made. Appellant, William E. Callaway, appeals from his conviction in the Akron Municipal Court for obstructing official business and resisting arrest. We reverse.

## I

{¶ 2} On July 18, 2004, the Akron Police Department received a nonemergency call from Alan Bailey of the Summit County Adult Protective Services, requesting law enforcement and EMS to conduct a "welfare check" at 718 Sylvan Avenue in Akron, Ohio, regarding the health of an elderly, bedridden male at that residence, namely, William's father, Walter Callaway. Bailey informed the police department that he had received information from a physician's office that several calls had been made from the Callaway residence. At no time during his conversation with the police dispatcher did Bailey mention that the calls from the physician's office suggested a medical emergency, and the dispatcher never mentioned to the officer who was to follow up on this call, Officer Alan Hamidi, that this phone call indicated an emergency.

{¶ 3} When asked to confirm whether he just wanted someone to check to make sure Walter was all right, Bailey explained the predicament as follows:

Yeah, it's one step above that. I don't think (inaudible) because this is secondhand. We have a history of some kind of situation. [Walter] is, oh he's 81, but he does have need at times for IV. He has dementia and is not compliant with either his diet, he could be dehydrated, he could be in need of an IV. He has a son that seems quite, admit there's a history of some overreacting. He's been calling a health agency, actually a Dr. Scroggins is his attending physician. He's been calling there about every few hours to say his dad needs help. He won't take his father to a hospital for fear his father will be put in a nursing home. Okay. I think this is (inaudible) my opinion, but it's shared, it's shared. The son may not be accurate as concerned because he's a little (inaudible). But there are medical situations the father is in.

\* \* \*

There's an adult there with Walter, that's the son. He just called minutes ago to the doctor while I was talking to the doctor's receptionist requesting medical attention again for his father. We're not medical professionals who go out there. So that's why I thought I'd call to you.

{¶ 4} Without a warrant, Officer Hamidi went to the Callaway residence, dressed in uniform, and knocked on the side door of the house. William looked out the window but did not notice a marked police car near the house. William then opened the door to see who was there, at which point the officer identified himself and informed William that he was sent there by Adult Protective Custody to follow up on a call. At his trial, William testified that the officer had told him that the call had indicated that an elderly man at that location was being abused, that both the police and the EMS were being sent to the house and that they actually needed to physically see Walter to make sure that he was all right. William responded that Walter was fine and that the officer was misinformed regarding any sort of abuse.

{¶ 5} The officer testified at trial that William "seemed to get really agitated" and that he began to pace back and forth behind the door. The officer testified that William then told the officer that he had not called the police and that the officer was not welcome there and "turned around abruptly to go back towards the door to go back inside the house." Before William could reenter the house, the officer insisted that he needed to come in the house to see Walter and warned William that if he resisted his entrance, that he would arrest him for obstructing official business. The officer testified that William then "clipped [the officer] on the right shoulder, and [said], no police coming in here and do nothin'." The officer testified that he then informed William that he was under arrest for obstructing official business and instructed William to put his hands behind his back. At trial, William denied hitting the police officer and asserted that the officer never actually started to place him under arrest outside of the house.

{¶ 6} Nevertheless, both William and the officer testified that William then darted toward the partially opened door to go inside the house and attempted to shut the door behind him. The officer testified that he held onto the partially fastened handcuffs, following William into the house. The entire time, the officer used pressure points on William's elbow to make him comply, but to no avail; William proceeded into the house, the officer holding on to him, and moved towards the kitchen. The officer then began to strike William's thigh with his knee, which did not make William acquiesce, either. The officer maintained that he continued to tell William that he was under arrest and that he needed to stop moving.

{¶ 7} William proceeded into the kitchen towards the telephone. He dialed 911, insisting that he was going to call the officer's supervisor, all the while the officer striking him with his knee. The officer stated that he then noticed that William was holding the phone above his head, a pose that apparently indicated to the officer that he was about to be struck with the phone. The officer pulled back from William, but then attempted to immobilize him with a Taser-gun shot to the chest. After a second shot, the Taser successfully immobilized William and brought him to the floor.

{¶ 8} After the officer successfully apprehended William, he called for backup. Then, EMS arrived on the scene.[1] The officer did eventually go upstairs to check on Walter; he found him lying on a hospital bed. Walter told the officer that he was fine.

{¶ 9} William was charged with one count of obstructing official business, in violation of Akron Codified Ordinances 136.11, a second-degree misdemeanor, and one count of resisting arrest, in violation of Akron Codified Ordinances 136.13, an first-degree misdemeanor. William pleaded not guilty to the charges.

{¶ 10} The case proceeded to a jury trial. At the close of the city's case and at the close of all the evidence, William's counsel moved for a judgment of acquittal pursuant to Crim.R. 29(A). The court denied the motions. A jury found William guilty of both charges, and the trial court sentenced him accordingly. The trial court stayed William's sentence pending appeal.

{¶ 11} William filed a pro se notice of appeal to this court from his conviction and sentence. Thereafter, appellate counsel was appointed to represent him, and William asserts by counsel two assignments of error for review.

---

1. The officer also encountered William Callaway's brother, Walter Callaway Jr., during this series of events inside the residence. The two engaged in a scuffle, and Walter Jr. was also eventually charged.

## II

### A

### First Assignment of Error

The city of Akron failed to prove beyond a reasonable doubt all elements of the crime of obstructing official business. Specifically, the city failed to prove that appellant Callaway acted 'without privilege' in refusing police entry to his home when the police had no warrant and no exigent circumstances. The city also failed to prove an authorized act and a lawful duty. The failure of proof beyond a reasonable doubt on all elements violated appellant Callaway's right to due process of law under the Due Process Clause of the Fourteenth Amendment.

{¶ 12} In his first assignment of error, William contends that the state failed to prove beyond a reasonable doubt all elements of the offense to obstructing official business. Thus, William maintains that his conviction for obstructing official business was not supported by sufficient evidence. We agree.

{¶ 13} "The test for 'insufficient evidence' requires the court to view the evidence in the light most favorable to the prosecution, and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Leggett* (Oct. 29, 1997), 9th Dist. No. 18303, at 4, 1997 WL 775688. We must determine, as a matter of law, whether the evidence was legally sufficient to support a conviction. Id. at 4. "In essence, sufficiency is a test of adequacy." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

{¶ 14} William maintains that the state failed to establish that he acted without privilege in refusing police entry into his father's home and that the police officer was engaged in an authorized act and lawful duty at the time. William was convicted of obstructing official business in violation of Akron Codified Ordinances 136.11, which provides, "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within his official capacity, shall do any act which hampers or impedes a public official in the performance of his lawful duties." The police officer in this case appeared at the residence without a warrant. The Fourth Amendment confers the constitutional right upon a defendant to refuse to consent to a warrantless entry, and the assertion of this right cannot be a crime. *Camara v. Mun. Court* (1967), 387 U.S. 523, 530–540, 87 S.Ct. 1727, 18 L.Ed.2d 930.

{¶ 15} The state responds that William cannot assert a privilege because he did not have a reasonable expectation of privacy in his father's home

and because the evidence does not establish that he was an overnight guest or otherwise had any proprietary interest in the home. The Fourth Amendment protects against unreasonable intrusions into an area in which the person attempting to invoke the Fourth Amendment protection has an actual subjective expectation of privacy that, when viewed objectively, is justifiable under the circumstances of the case. *State v. Robinson* (1995), 103 Ohio App.3d 490, 494, 659 N.E.2d 1292, citing *Smith v. Maryland* (1979), 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220. William maintains that he was an invited guest at his father Walter's home and that he has sufficient contact and control over Walter's residence to create a legitimate expectation of privacy in the home. A host's ultimate control of his home does not obviate the possibility that a guest in his home may have a legitimate expectation of privacy even though the guest does not have a legal interest or authority to determine who enters the home. *Minnesota v. Olson* (1990), 495 U.S. 91, 99, 110 S.Ct. 1684, 109 L.Ed.2d 85. "A subjective expectation of privacy is legitimate if it is ' "one that society is prepared to recognize as 'reasonable.' " ' " Id. at 95, 110 S.Ct. 1684, 109 L.Ed.2d 85, quoting *Katz v. United States* (1967), 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (Harlan, J., concurring). William maintains that his expectation of privacy in his father's home is one that society would be willing to recognize as legitimate and is thus protected by the Fourth Amendment.

{¶ 16} William does not live with his father, Walter. However, the nature of the time he spends at Walter's home is closer in character to that of an overnight guest. William has the responsibility of providing Walter's home care. William comes to the home to take care of Walter, with whom he has a strong relationship. Furthermore, William's care-giving responsibilities to Walter and Walter Jr. necessitate that he spend frequent and lengthy periods at the home. Walter has dementia, is bedridden and cannot walk, and has difficulty feeding and cleaning himself. Additionally, William watches over his brother Walter Jr., who has a mental disorder and lives with their bedridden father. William was not at the home to pursue some sort of business venture or for his own use; rather, he was there because he played an integral role in Walter's well-being and survival. Cf. *Minnesota v. Carter* (1998), 525 U.S. 83, 91, 119 S.Ct. 469, 142 L.Ed.2d 373. Thus, we disagree with the state's position and conclude that William did indeed have a reasonable expectation of privacy in his father's home.

{¶ 17} Although William did not protest the officer's presence at his front door, his subsequent attempt to close the door constituted an exercise of his privilege to refuse entry and the termination of any consensual encounter. See, e.g., *State v. Cummings* (Jan. 16, 2002), 9th Dist. No. 20609, 2002 WL 57979, at *11. Without a warrant, the officer needed more than the mere possibility of harm to justify entry over William's objection. The police officer conceded at

trial that he did not know whether the phone call received by the dispatcher had been verified for legitimacy. There was no indication that an inquiry had been made into the reliability of the informant who had made the call. William insisted that he was not the one who had called EMS or the police initially; he noted that there was a possibility that either Walter or Walter Jr. might have tried to contact EMS.

{¶ 18} It is clear that an emergency did not exist at the residence; the call did not suggest that there was an imminent need to save a life or avoid serious injury. See *State v. Applegate* (1994), 68 Ohio St.3d 348, 349, 626 N.E.2d 942. While the EMS was dispatched to the scene as well, they did not arrive until after the police officer had already encountered William and engaged him in what became an argumentative conversation and physical struggle. While the police officer did eventually make his way up to the second floor to see Walter, once he got to Walter he could do no more than simply *ask* Walter whether he was all right. The police officer did not examine him or ask him any medical questions, and rightly so; that task was appropriately left to the EMS to handle. Given the information relayed to the officer, there was no emergency medical need that he could satisfy. Furthermore, other than William's nervous pacing back and forth in front of the door while contemplating how to handle the police officer's presence, there is nothing in the testimony to indicate that anything suspicious or criminal was occurring at the residence.

{¶ 19} Another officer who arrived at the scene testified as to the commonness of answering calls to check someone's welfare. Certainly, if a call is made that indicates a medical emergency or even the possibility of imminent death, that situation might warrant any action necessary to enter the home and check the person. However, that is not the case here. Walter was not alone. He was being attended by William, who attested to his father's physical state and, as even the caller stated, had made calls to Walter's physician to seek medical help and spent much time at the residence. Cf. *State v. Russell* (1998), 127 Ohio App.3d 414, 418, 713 N.E.2d 56 (no response when law enforcement knocked on the door of a missing person). William testified that the family frequently made calls to Walter's physician for medical assistance. William did testify that no one in the family made a call to the doctor the day the officer came to the house.

{¶ 20} Based upon the foregoing, we conclude that the state failed to establish beyond a reasonable doubt that William was acting without a privilege and that the police officer's entry into the home was lawful. See *Leggett*, 9th Dist. No. 18303, at 3–4; Akron Codified Ordinances 136.11. Therefore, we find that William's conviction for obstructing official business is not supported by sufficient evidence. Accordingly, William's first assignment of error is sustained.

790

B

## Second Assignment of Error

The city of Akron violated Section 3, Article XVIII, of the Ohio Constitution when it enacted Akron Codified Ordinance § 136.13 [resisting arrest], as it conflicts with R.C. § 2921.33 in permitting convictions where the arrest was not proven to be lawful. Since the Akron ordinance under which appellant Callaway was convicted is unconstitutional, his conviction was void.[2]

{¶ 21} In his second assignment of error, William asserts that Akron Codified Ordinances 136.13 is unconstitutional because it is in conflict with R.C. 2921.33, resisting arrest, and that therefore, his conviction for resisting arrest is void. In particular, William argues that Section 136.13 is inconsistent in application and effect with R.C. 2921.33. We agree.

██ {¶ 22} William did not raise this constitutional challenge before the trial court. Generally, an issue cannot be raised for the first time on appeal, and a reviewing court has the discretionary authority to decline to address an issue that was not brought initially before the lower court. *State v. Awan* (1986), 22 Ohio St.3d 120, 122, 22 OBR 199, 489 N.E.2d 277. However, the Supreme Court of Ohio has proclaimed that a reviewing court may choose to address a constitutional challenge to the application of a statute although it was not initially raised in the trial court, "in specific cases of plain error or where the rights and interests involved may warrant it." See *In re M.D.* (1988), 38 Ohio St.3d 149, 527 N.E.2d 286, syllabus. Because of the specific circumstances of the instant case, we have elected in our discretion to address William's conflict argument.

 {¶ 23} The constitutionality of a statute or ordinance presents a question of law and is therefore reviewed under a de novo standard. *Andreyko v. Cincinnati*, 153 Ohio App.3d 108, 2003-Ohio-2759, 791 N.E.2d 1025, at ¶ 11; *Hiatt v. S. Health Facilities, Inc.* (Oct. 13, 1992), 4th Dist. No. 91CA2025, 1992 WL 308299. In determining the constitutionality of an ordinance, we are mindful of the fundamental principle requiring courts to presume the constitutionality of lawfully enacted legislation. *Akron v. Molyneaux* (2001), 144 Ohio App.3d 421, 426, 760 N.E.2d 461, citing *Univ. Hts. v. O'Leary* (1981), 68 Ohio St.2d 130, 135,

---

2. Upon our grant of William's application for reconsideration of this assignment of error in a journal entry dated May 17, 2005, this court allowed both parties to submit briefs or file supplemental briefs on this issue, within 20 days of the date of the entry. On May 25, 2005, William's counsel filed a notice to rely on the original briefs filed in the case. The state then filed a supplemental brief. On June 14, 2005, William filed a reply brief. Thereafter, the state filed a motion to strike the reply brief on the basis that it was filed well past the 20–day prescribed time limit and without leave of court. The state's motion is granted, and William's reply brief is stricken.

22 O.O.3d 372, 429 N.E.2d 148. The legislation being challenged will not be invalidated unless the challenger establishes that it is unconstitutional beyond a reasonable doubt. *Molyneaux*, 144 Ohio App.3d at 426, 760 N.E.2d 461. However, sections of the Revised Code defining offenses or penalties are to be strictly construed against the state but liberally construed in favor of the defendant. R.C. 2901.04(A); *State v. Hiatt* (1997), 120 Ohio App.3d 247, 254, 697 N.E.2d 1025, citing *State v. Quisenberry* (1994), 69 Ohio St.3d 556, 634 N.E.2d 1009.

{¶ 24} In interpreting an ordinance or statute, words and phrases must be read in context and construed according to the rules of grammar and common usage. R.C. 1.42; *Indep. Ins. Agents of Ohio, Inc. v. Fabe* (1992), 63 Ohio St.3d 310, 314, 587 N.E.2d 814. Courts do not have authority to ignore the plain and unambiguous language of a statute, but must give effect to the words used. *Czubaj v. Tallmadge*, 9th Dist. No. 21389, 2003-Ohio-5466, 2003 WL 22339267, at ¶ 13.

{¶ 25} As a chartered municipal corporation, Akron is authorized by the Home Rule Amendment "to exercise all powers of local self-government and to adopt and enforce within [its] limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." *FOP v. Akron*, 9th Dist. No. 20646, 2002-Ohio-2649, 2002 WL 1263956, at ¶ 16, quoting Section 3, Article XVIII, Ohio Constitution. The test for determining whether an ordinance violates the Home Rule Amendment by conflicting with general law is "whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, paragraph two of the syllabus. " 'Where there is a direct conflict, the state regulation prevails.' " *E. Ohio Gas Co. v. Akron* (1978), 60 Ohio App.2d 21, 32, 14 O.O.3d 10, 395 N.E.2d 511, quoting *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 66, 73 O.O.2d 285, 337 N.E.2d 766.

{¶ 26} Akron Codified Ordinances 136.13, resisting arrest, states:

(A) In the absence of excessive or unnecessary force by an arresting officer, no person, recklessly or by force, shall resist or interfere with an arrest of himself or another, *whether or not the arrest is illegal under the circumstances,* provided that such person knows, or has good reason to believe, that the arresting officer is a law enforcement officer engaged in the performance of his duties.

(Emphasis added.)

{¶ 27} The Ohio Revised Code section governing resisting arrest, R.C. 2921.33, provides:

(A) No person, recklessly or by force, shall resist or interfere with a *lawful arrest* of the person or another.

(B) No person, recklessly or by force, shall resist or interfere with a *lawful arrest* of the person or another person and, during the course of or as a result of the resistance or interference, cause physical harm to a law enforcement officer.

(C) No person, recklessly or by force, shall resist or interfere with a *lawful arrest* of the person or another person if either of the following applies:

(1) The offender, during the course of or as a result of the resistance or interference, recklessly causes physical harm to a law enforcement officer by means of a deadly weapon;

(2) The offender, during the course of the resistance or interference, brandishes a deadly weapon.

(Emphasis added.)

{¶ 28} As distinguished from R.C. 2921.33, Akron Codified Ordinances 136.13 proscribes the resistance of any arrest, whether legal or illegal under the circumstances. The Revised Code requires the arrest to be lawful to sustain the charge of resisting arrest and thereby imposes a burden on the prosecution to prove this element. William argues, "When the City of Akron prosecutes resisting arrest under its Ordinance it is relieved of this burden resulting in an unconstitutional conflict with the elements required to convict an individual of Resisting Arrest elsewhere in the State of Ohio." See *Elyria v. Tress* (1991), 73 Ohio App.3d 5, 9, 595 N.E.2d 1031 ("The legislature has elected to make a 'lawful arrest' an element of R.C. 2921.33(A)," so "the Ohio statute does not prohibit resisting unlawful arrest").

{¶ 29} Upon review, we find that the statute in effect permits that which the ordinance *expressly* prohibits. While R.C. 2921.33 in effect allows a person to resist an unlawful arrest, Akron Ordinances 136.13 explicitly proscribes such resistance. Therefore, we must conclude that Akron Codified Ordinances 136.13 is in conflict with the general law of the state of Ohio, R.C. 2921.33, and therefore amounts to a constitutional violation. See Section 3, Article XVIII, Ohio Constitution. See, also, *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 87, 167 N.E. 158 ("It surely would be absurd to claim that an ordinance which attempted to prohibit an act which a statute has thus declared shall not be prohibited is in harmony with such statute").

{¶ 30} William brings to this court's attention the precedent we established in *Akron v. DeLorenzo* (Sept. 27, 1984), 9th Dist. No. 11647, 1984 WL 3957, in which this court held that the former Akron Codified Ordinances section governing resisting arrest, Section 606.16, which is identical to the current ordinance, does not unconstitutionally conflict with R.C. 2921.33. This court reasoned:

Neither authority positively permits an act which is prohibited by the other. The Akron ordinance makes it a criminal offense to resist an unlawful arrest. This conduct is not proscribed by R.C. 2921.33; however, the state statute does not say that persons have a right to resist an unlawful arrest. Thus, there is no actual conflict. The ordinance merely fills a gap in the law where the General Assembly has not spoken.

Id.

{¶ 31} Because of our conclusion in this case that the ordinance is in conflict with the statute, we must overrule *DeLorenzo* to the extent that it concluded to the contrary.

{¶ 32} Therefore, we find that Akron Codified Ordinances 136.13 is unconstitutional and therefore void. William's second assignment of error is sustained, and his conviction for resisting arrest under the ordinance is also void.

### III

{¶ 33} William Callaway's first and second assignments of error are sustained. The conviction in the Akron Municipal Court is reversed, and the cause is remanded for further proceedings consistent with this decision.

Judgment reversed
and cause remanded.

MOORE, J., concurs.

WHITMORE, P.J., concurs in part and dissents in part.

WHITMORE, P.J., concurring in part and dissenting in part.

{¶ 34} I respectfully dissent from the second portion of the majority's opinion. While I agree that William Callaway's obstruction-of-official-business conviction must be reversed, I disagree with the majority's determination that Akron Codified Ordinances 136.13 conflicts with R.C. 2921.33 and is therefore unconstitutional and void. Though this case presents troubling facts, the dispositive issue is what occurred when Officer Hamidi informed appellant that he was under arrest. Once told he was under arrest, Callaway had a duty to cooperate and not impede the officer in the performance of his perceived duty.

{¶ 35} Specifically, I disagree with the majority's opinion that "R.C. 2921.33 in effect allows a person to resist an unlawful arrest." That finding is fraught with potential problems including confusion in the minds of police officers and citizens and the possibility of encouraging citizens to resist arrests because they subjectively believe the arrest to be unlawful.

{¶ 36} Moreover, I would not overrule *Akron v. DeLorenzo* (Sep. 27, 1984), 9th Dist. No. 11647, 1984 WL 3957. I agree with this court's previous determination in *DeLorenzo* that no conflict exists between the Akron resisting-arrest ordinance and R.C. 2921.33. I agree with our previous finding that "[n]either authority positively permits an act which is prohibited by the other." Id. at 7. I agree with the *DeLorenzo* opinion that the Akron ordinance "merely fills a gap in the law where the General Assembly has not spoken." Id.

{¶ 37} The *DeLorenzo* opinion discussed *Columbus v. Fraley* (1975), 41 Ohio St.2d 173, 70 O.O.2d 335, 324 N.E.2d 735, which I believe directly contradicts the majority's position that Ohio law permits resistance to an unlawful arrest. The *Fraley* court discounted the common-law position that one had a right to resist an unlawful arrest. In fact, the court directly disagreed with the appellant's position that because her arrest was unlawful she had a right to resist it. *Fraley*, 41 Ohio St.2d at 178, 70 O.O.2d 335, 324 N.E.2d 735. Further, the *Fraley* court abandoned the rule allowing forcible resistance to arrest. Id. at 180, 70 O.O.2d 335, 324 N.E.2d 735.

{¶ 38} I also note that the word "lawful" within the meaning of the statute does not conflict with the Akron ordinance. In determining whether an arrest was lawful, it must be determined "whether there was a 'reasonable basis' for the arrest and not whether the elements of the underlying charge were or could have been proven beyond a reasonable doubt." *State v. McCrone* (1989), 63 Ohio App.3d 831, 835–36, 580 N.E.2d 468. "A reasonable basis means whether a reasonable police officer under similar circumstances would have concluded that the defendant had committed a crime." Id. at 836, 580 N.E.2d 468. Such a definition has also been found to define legal arrest. See *State v. Thompson* (Nov. 9, 1993), 4th Dist. No. 92CA1906, 1993 WL 472907, at *3. In my opinion, "lawful arrest" as used in R.C. 2921.33 does not conflict with the Akron ordinance. Accordingly, I respectfully dissent from the majority's opinion on the constitutionality of the Akron ordinance.