DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Linda Shirey has appealed from her conviction in the Summit County Court of Common Pleas of endangering children. This Court affirms.
 I {¶ 2} On June 3, 2004, Defendant-Appellant Linda Shirey was indicted on one count of endangering children in violation of R.C. 2919.22(B)(3), a felony of the third degree, and one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fifth degree. Appellant waived arraignment on June 11, 2004 and entered "not guilty" pleas to both charges in the indictment. On September 9, 2004, the State filed a supplemental indictment that charged Appellant with one count of child endangering in violation of R.C. 2919.22(B)(1), a misdemeanor of the first degree. Appellant also pled "not guilty" to this charge.
 {¶ 3} On November 10, 2004, Appellant executed a time waiver in the instant case. A jury trial commenced on February 10, 2005 whereupon the State dismissed count one of the indictment, the felony child endangering charge. Upon completion of the trial the jury returned a verdict of "not guilty" as to the charge of domestic violence contained in count one of the indictment and "guilty" as to the charge of misdemeanor endangering children as contained in the supplemental indictment.
 {¶ 4} Appellant has timely appealed her conviction, asserting two assignments of error.
 II Assignment of Error Number One
"THE MISDEMEANOR CHILD ENDANGERING CHARGE WAS IN VIOLATION OF OHIO'S SPEEDY TRIAL STATUTE BECAUSE NINETY DAYS OF SPEEDY TRIAL TIME HAD ALREADY ELAPSED WHEN IT WAS DISMISSED AND LATER RE-FILED AFTER OBTAINING A FELONY INDICTMENT."
 {¶ 5} In her first assignment of error, Appellant has argued that the misdemeanor child endangering charge with which she was ultimately convicted of in Summit County Common Pleas Court was in violation of her speedy trial rights. Specifically, Appellant has argued that the misdemeanor child endangering charge was initially brought against her in the Akron Municipal Court, where she was arraigned and pled not guilty. Further, Appellant has argued that the time elapsed between her arraignment in Akron Municipal Court and the dismissal of the charge without prejudice in lieu of a felony charge in the Summit County Court of Common Pleas exceeded the 90 day maximum allowed by R.C. 2945.71(B)(2). Appellant has argued this violation should nullify her conviction. We disagree.
 {¶ 6} We have held that it is the responsibility of Appellant to provide this Court with a record of the facts, testimony, and evidentiary matters necessary to support the assignments of error. Diehl v. Frost Tile Marble, Inc., 9th Dist. No. 22700,2005-Ohio-6456, at ¶ 5. Appellant has not provided us with a record that includes any information regarding the Akron Municipal Court case.
 {¶ 7} On August 16, 2005, Appellant moved this Court to supplement the appellate record with the record in Akron Municipal Court case City of Akron v. Linda Shirey, 2003 CRB 14350. We denied Appellant's motion because it is axiomatic that the record on appeal may only contain matters that were actually before the trial court. See Bacon v. Donnet, 9th Dist. No. 21201, 2003-Ohio-1301, at fn.2. A reviewing court cannot permit anything to be added to the record which was not part of the trial court's proceedings and then use the added matter to decide the appeal. State v. Hill (2001), 90 Ohio St.3d 571, 573. Because Appellant did not demonstrate that the matter sought to be added was part of the trial court's proceedings, the motion to supplement the record was denied.
 {¶ 8} Because the appellate record contains no reference to the Akron Municipal Court case, we cannot determine whether Appellant's speedy trial rights were violated. Further, because Appellant cannot identify the relevant portion of the record to support her assignments of error, this Court may disregard those arguments. Patio Enclosures, Inc. v. Four Seasons MarketingCorp., 9th Dist. No. 22458, 2005-Ohio-4933, at ¶ 52. See App.R. 12(A)(2); Loc.R. 7(E).
 {¶ 9} Additionally, Appellant did not object to the alleged speedy trial violation while on trial, nor did she bring the issue to the trial court's attention. Generally, "an issue cannot be raised for the first time on appeal, and a reviewing court has the discretionary authority to decline to address an issue that was not brought initially before the lower court." Akron v.Callaway, 162 Ohio App.3d 781, 2005-Ohio-4095, at ¶ 22. It is clear to this Court that if Appellant's speedy trial rights were violated, the issue should have been brought to the attention of the trial court and the trial court record should have been supplemented with the appropriate information.
 {¶ 10} Appellant has argued that defense counsel's failure to object to the speedy trial violation and its failure to raise the speedy trial issue constitute ineffective assistance of counsel. Appellant has cited our holding in State v. Smith (Dec. 22, 1999), 9th Dist. No. 98CA007144, that where "appellant's right to a speedy trial was not violated, his trial counsel did not err in failing to make a motion to dismiss[.]" Id. at 7. Appellant has inverted this holding and argued that where an appellant's right to a speedy trial is violated, defense counsel is per se ineffective for failing to file a meritorious motion to dismiss.
 {¶ 11} First, we note that even if Appellant's proposed rule were a correct statement of law, we are unable to discern in fact whether Appellant's speedy trial rights were violated due to the lack of a record concerning Akron Municipal Case 2003 CRB 14350. As discussed supra, Appellant's failure to raise the speedy trial issue before the trial court precludes us from reviewing whether a speedy trial violation occurred, and subsequently whether the failure to file a motion to dismiss would be per se ineffective assistance of counsel.
 {¶ 12} Second, and most importantly, Smith contained no such holding regarding per se ineffective assistance of counsel.[1] In crafting her proposed rule out of the whole cloth of Smith, Appellant has completely bypassed our long held test for ineffective assistance of counsel. This Court has repeatedly maintained that we employ a two-step method in determining whether the right to effective counsel has been violated. See, e.g., State v. Bradford, 9th Dist. No. 22441,2005-Ohio-5804, at ¶ 25; State v. Paige, 9th Dist. No. 22377,2005-Ohio-5810, at ¶ 22. First, the appellant must show that trial counsel's performance was deficient. State v. Ray, 9th Dist. No. 22459, 2005-Ohio-4941, at ¶ 9, citing Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct 2052,80 L.E.2d 674. In determining deficiency, this Court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." (Quotations omitted). State v.Calhoun (1999), 86 Ohio St.3d 279, 289. Second, the "defendant must show that the deficient performance prejudiced the defense."Strickland, 466 U.S. at 687. The Ohio Supreme Court has held that such prejudice exists when there is a "reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136, 143, certiorari denied (1990), 497 U.S. 1011,110 S.Ct. 3258, 111 L.Ed.2d 768.
 {¶ 13} In the case sub judice, Appellant has argued that defense counsel's failure to object or raise the issue of a speedy trial violation constituted ineffective assistance of counsel. We disagree. In order to establish prejudice, an appellant must overcome a strong presumption that licensed attorneys are competent and that the challenged action is the product of a sound strategy. State v. Jones, 9th Dist. No. 22545, 2005-Ohio-5502, at ¶ 18. Additionally, debatable trial tactics do not give rise to a claim of ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45, 49, certiorari denied (1980), 449 U.S. 879, 101 S.Ct. 227,66 L.Ed.2d 102. This Court has held on more than one occasion that a failure to object is within the realm of trial tactics and therefore does not establish ineffective assistance of counsel. See, e.g.,State v. Taylor, 9th Dist. No. 01CA007945, 2002-Ohio-6992, at ¶ 76. Therefore, we conclude that defense counsel's failure to object or raise the issue of a speedy trial violation does not constitute ineffective assistance of counsel. Appellant's first assignment of error lacks merit.
 Assignment of Error Number Two
"THE CHILD ENDANGERING CONVICTION UNDER ORC § 2919.22(B)(1) IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THE RECORD LACKS EVIDENCE THAT DEFENDANT ABUSED HER GRANDSON BY CAUSING SERIOUS PHYSICAL HARM. THE RECORD ALSO LACKED EVIDENCE THAT THE GRANDSON'S BRUISES POSED A SUBSTANTIAL RISK TO THE CHILD'S HEALTH OR SAFETY."
 {¶ 14} In her second assignment of error, Appellant has argued that her conviction of child endangering is against the manifest weight of the evidence. Specifically, Appellant has argued that nothing in the record proved that she, the victim's paternal grandmother, harmed or abused her grandson ("F.J."). Further, she has argued that the evidence presented did not prove F.J.'s injuries created a "substantial risk of serious harm to the physical health or safety of the child" as required by Ohio law. We disagree.
 {¶ 15} In determining whether a conviction is against the manifest weight of the evidence an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 16} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. Id. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karches v. Cincinnati (1988), 38 Ohio St.3d 12,19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 17} Appellant was convicted of one count of child endangering, in violation of R.C. 2919.22(B)(1), a misdemeanor of the first degree. R.C. 2919.22(B)(1) provides that "[n]o person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age * * * Abuse the child[.]" As discussed above, Appellant has argued that the State failed to establish that Appellant actually abused F.J. by causing serious physical harm and that the evidence adduced at trial failed to establish that the bruises F.J. suffered from were a substantial risk to the child's health or safety.
 {¶ 18} We begin by noting that it was not necessary for the State to establish "serious physical harm." R.C. 2919.22(E)(2)(a) states that endangering children in violation of R.C. 2919.22(A) or (B)(1), is a misdemeanor of the first degree, unless otherwise provided for in the section. R.C. 2919.22(E)(2)(d) provides that "[i]f the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child" the abuse is a felony of the second degree. Serious physical harm is required for a felony charge of endangering a child under R.C.2919.22(B)(1), but is not required for the misdemeanor charge with which Appellant was convicted. Further, R.C. 2151.031(D) defines an "abused child" as one who "[b]ecause of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare." Therefore, to convict on a charge of misdemeanor child endangering, a jury must find that Appellant caused physical or mental injury to F.J. that harmed or threatened to harm his health or welfare. As a result, Appellant's cited cases referring to "serious" harm are inapposite to the matter before us.
 {¶ 19} During the trial, the State presented testimony from nine witnesses. Jamie Jessmer ("Jamie"), F.J.'s mother, testified to the following. On Friday, November 21, 2003, Appellant picked F.J. up to spend the weekend at her home. Jamie did not see F.J. again until Sunday afternoon when Appellant dropped him off in Jamie's driveway. Jamie further testified that F.J. normally would want to stay with Appellant and play with the other children, but on this occasion he grabbed her tightly and didn't want to go with Appellant. Appellant was abnormally quiet and handed Jamie the bag of clean clothes she had sent with F.J. and sped off. Jamie then went to her parent's house to give F.J. a bath. Jamie testified that when she undressed him and placed him in the water, F.J. yelled in pain and Jamie discovered that he had been beaten on the back. Jamie testified that she immediately called Children's Services, the police, and took F.J. to Children's Hospital.
 {¶ 20} On cross-examination, Jamie testified that Appellant had bought F.J. a bike and Jamie had seen him fall off the bike before. She testified that F.J. had been in counseling since September 2003 and suffers from attention deficit hyperactivity disorder ("ADHD"). F.J. has been diagnosed as self-destructive and he would hit and bite other children. F.J. has been described by the counselor as defiant and quick tempered. F.J. has a daredevil type mentality. Jamie averred that F.J. does not have bi-polar disorder, but is simply ADHD. Finally, Jamie testified that after F.J. started a fire and burned himself in February 2004, he was placed full time with her parents.
 {¶ 21} On redirect, Jamie testified that Appellant continually threatened to harm them if Jamie kept Appellant away from her grandchildren. Jamie testified that Appellant had attacked her with a frying pan in the past.
 {¶ 22} Dr. Emily Scott, pediatric emergency medicine fellow at Akron Children's Hospital testified to the following. Through her training, rotations through the CARE Center, lectures, and emergency room practice, she has experience with child abuse. As a practitioner of pediatric medicine, she has been trained to detect accidental as opposed to inflicted injury. During her time at Akron Children's Hospital, she has had to make determinations as to whether an injury is accidental or non-accidental.
 {¶ 23} Dr. Scott testified that she examined F.J. on November 23, 2003 and obtained the child's medical history from the child and his mother. Upon her examination of F.J., he stated that "Grandma hit me. Grandma Linda hit me in the back with her hand." Dr. Scott testified that she then examined his back and took photographs of the multiple, linear bruises running horizontally on his back. Dr. Scott further testified that linear bruises always raise the suspicion of inflicted injury. Dr. Scott's examination revealed that a hand could fit right over the bruises, in the same pattern as an adult hand, and thus concluded the bruising was a handprint. Dr. Scott testified that F.J also had some old bruising on his extremities, which is commonly considered accidental because legs and arms are exposed, unlike the back. Dr. Scott further opined that it is unusual to have trauma on the back, especially in November. Dr. Scott testified that the linear bruising also had tiny bruises with the thumb space, enhancing her belief that the bruises were from a right, adult sized hand.
 {¶ 24} Based up her training, education and experience, Dr. Scott testified that it would require a significant amount of force to leave a handprint in the form of a bruise. In her medical opinion, the bruises were inconsistent with the normal activity of a three year old child. They were consistent with a pattern of inflicted injury. Dr. Scott testified that her opinion, to a reasonable degree of medical certainty, was that F.J. had been physically abused.
 {¶ 25} On cross-examination Dr. Scott testified to the following. Her examination revealed F.J. to be active, alert and in no distress and by all accounts in good physical condition. The exam was normal, with the exception of the multiple, linear bruises. F.J.'s vital signs were normal. F.J. appeared to be a normal, active three year old. Dr. Scott did not prescribe any medications, nor did she order physical therapy or X-rays. She never measured the bruise or anyone's hand, she simply placed her own hand over the bruises. Dr. Scott testified that it was never reported to her that F.J. had been sliding down stairs.
 {¶ 26} On redirect examination, Dr. Scott testified that if she had been informed that F.J. had been sliding down the stairs, it would not have changed her opinion.
 {¶ 27} Pamela Lewis ("Pamela"), roommate of Jamie Jessmer, testified to the following. On November 21, 2003, Appellant came to the home to pick F.J. up. While dressing him, she did not observe any injuries on his back. Appellant brought F.J. back early on Sunday which was unusual. Pamela testified that Appellant told her that the children were acting up and she couldn't take anymore. Appellant kept F.J. with her because Jamie was not at home. Approximately one hour later, Appellant returned and left F.J. with Jamie, who had arrived from church.
 {¶ 28} On cross-examination, Pamela testified to the following. Appellant would take F.J. every weekend and would generally have all of her grandchildren over to her house every weekend. After coming back from the hospital, F.J. showed her his back and stated that "Grandma Linda done it."
 {¶ 29} Lisa Graefe, Jamie's sister, testified that she did not observe any bruises or injury on F.J. on November 21, 2003. On cross-examination, she testified that F.J. is an active boy and that she has observed his hyperactivity, but that he wasn't more hyperactive than other children.
 {¶ 30} Beth and James Rader, Jamie's parents, testified that after church on November 23, 2003, they, Jamie, and Jamie's two other children Ashley and Roger went to Jamie's house to wait for Appellant to return F.J. Appellant arrived, dropped F.J. off and left without saying anything. When Beth lifted F.J. into their Jeep Cherokee, F.J. complained that she had hurt his arm. They testified that they took F.J. to their house in Cuyahoga Falls for a bath because he was dirty. When Jamie put F.J. into the tub, Jamie asked Beth to look at his back, which Beth described as "a mess." Beth further testified that F.J. had expressed fears to his counselor concerning Appellant.
 {¶ 31} On cross-examination, Beth testified that F.J. had been placed in her custody. She testified that three of Jamie's five children live with her. She testified that sometimes there are long intervals between Jamie's visits to her children. Finally, she testified that according to the counselor, F.J. has improved since leaving Jamie's care. Beth testified that this was the first time any issues were raised concerning Appellant or her care of F.J.
 {¶ 32} Officer Douglas McHenry of the Akron Police Department ("APD") testified that he responded to Akron Children's Hospital on November 23, 2003 in reference to alleged child abuse. He testified that he saw F.J. that day and spoke with Jamie. F.J. did not act out during the interview. After completing the initial report, Officer McHenry turned the case over to the detective bureau.
 {¶ 33} Detective Gary Shadie of the APD testified that as a member of the juvenile division, he has had training regarding the investigation of physical and sexual abuse. Detective Shadie was not present at the hospital but received the report concerning F.J. Thereafter, he contacted Jamie and met with Appellant at her home to discuss the case. Appellant conceded that she routinely had F.J. and her other grandchildren over to provide respite for their parents. Appellant often had as many as eight children in her home at one time. Detective Shadie testified that Appellant stated that F.J. was in a bad mood, that he was not listening, and was abusing his cousins. Appellant told Detective Shadie that F.J. had kicked a cousin in the face and that she had spanked him, sat him in time out, and eventually rocked him to sleep. Appellant denied having hit F.J. with a belt.
 {¶ 34} The defense called five witnesses. Three children related to Appellant staying at her home the weekend of November 21, 2003, S.R., N.M. and Z.R., all testified that F.J. was hurt twice when crashing his bicycle and falling off his skateboard. All three children testified that F.J. hurt himself sliding down the steps at Appellant's home. Further, all three children testified that F.J. kicked one of the other children numerous times in the leg and head and that Appellant spanked F.J. once, sat him in timeout and then rocked him to sleep. N.M. and Z.R. testified that Appellant did not use a belt to spank F.J. Notably, on cross-examination, S.R. testified that when speaking with the prosecutor earlier, he had never mentioned anything about sliding down the stairs.
 {¶ 35} Belinda Studenik, the mother of one of the children staying at Appellant's home the weekend of November 21, 2003, testified that she has no reservations about leaving her children with Appellant.
 {¶ 36} Appellant testified that she has been keeping her grandchildren on the weekends for thirteen years. Appellant testified that on Saturday, F.J. fell off of his bike and hurt his knee. He also fell off a skateboard and hurt his head. Later that evening, F.J. hurt himself sliding down the steps. Appellant testified that she pulled up his shirt to check for injury and noticed that his neck was red. Appellant testified that F.J. had kicked another child numerous times and in response, she had spanked F.J. once on the bottom with her hand. Appellant denied ever hitting F.J. with a belt.
 {¶ 37} After careful review of the entire record, including the photographic evidence submitted by the State, weighing the evidence and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of abusing F.J. under the child endangerment statute. The jury was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Appellant's conviction was not against the manifest weight because the jury chose to believe the testimony of Jamie, Beth and James Rader, and Dr. Scott and not that of Appellant and the child witnesses. See State v. Gilliam
(Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. Moreover, "in reaching its verdict, the jury is free to believe, all, part, or none of the testimony of each witness." Prince v. Jordan, 9th Dist. No. 04CA008423, 2004-Ohio-7184, at ¶ 35, citing State v.Jackson (1993), 86 Ohio App.3d 29, 33. As the factfinder, the jury was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported a finding of guilt. SeeDeHass, supra.
 {¶ 38} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence. Appellant's second assignment of error lacks merit.
 III {¶ 39} Appellant's two assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, P.J. Concurs.
[1] Smith's holding, which Appellant has used to craft her proposed rule, has nothing to do with per se ineffective assistance of counsel. In Smith, this Court performed aStrickland analysis to determine that defense counsel's failure to file a motion to dismiss was not deficient under the firstStrickland prong. Smith at 7-8.